UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| WENDY ANDERSON, as Administrator | ) | |
| of the Estate of John Wayne Siple, *et al.,* | ) | |
| | ) | CIVIL ACTION FILE NO.: |
| Plaintiffs, | ) | 1:12-cv-00031 |
| | ) | |
| v. | ) | |
| | ) | |
| COLUMBIA COUNTY, GEORGIA, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COUNTY DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

NOW COME defendants Columbia County, Georgia; Clay Whittle, individually and in his official capacity as Sheriff for Columbia County; Stanley Young, individually and in his official capacity; Travis Smith, individually and in his official capacity; Travis Whitaker, individually and in his official capacity; and David Miller, individually and in his official capacity (collectively "the County Defendants"), and file this Statement of Undisputed Material Facts pursuant to Rule 56.1 of the Local Rules of the Southern District of Georgia.

1.      John Wayne Siple was arrested on March 24, 2011 and charged with Felony Manufacturing of Marijuana and Possession of Marijuana with Intent to Distribute.  (Exh. "A" – Woods Declaration at ¶ 4 and Declaration Exh. "1".)

2.      Siple was booked into the Columbia County Detention Center around midnight on March 24, 2011. (Exh. "A" –Woods Declaration at ¶ 5.)

3.      During the booking process, a deputy jailer spoke with Siple and completed an intake screening form regarding Siple's medical condition. (Exh. "A" –Woods Declaration at ¶ 7 and Declaration Exh. "3"; Exh. "B" – Williamson Deposition at pp. 30-31.)

4.      The purpose of the intake screening form is to identify any health problems an inmate may have and to assess whether or not an inmate is a suicide risk so that Detention Center staff can take appropriate steps to protect the inmate's health and welfare. (Exh. "A" – Woods Declaration at ¶ 8.)

5.      Nurse Jo Williamson also spoke with Siple to verify the information taken by the deputy.  (Exh. "B" – Williamson Deposition at pp. 30-31.)

6.      During booking, Siple indicated that he used Percocet and Xanax. (Exh. "A" – Woods Declaration at ¶ 7 and Declaration Exh. "3"; Exh. "B" – Williamson Deposition at p. 32.)

7.      The morning after he was arrested, Siple was seen by Nurse Elizabeth Ball, a Mental Health Nurse, and by Nurse Alicia Martin, Southern Health Partners' Medical Team Administrator. (Exh. "C" – Ball Deposition at p. 26; Exh. "D" – Martin Deposition at p. 51. )

8.      During the examination, Nurse Ball completed a written progress note and filled out an assessment form regarding Siple. (Exh. "C" – Ball Deposition at pp. 25-26 and 55; Exh. "E" – Medical Records at pp. 1 and  8. )

9.      Siple told Nurse Ball that he would have a seizure if he was not given something for Xanax withdrawal. (Exh. "C" – Ball Deposition at p. 26.)

10.      Siple also indicated that he was taking pain medication because of a motor vehicle accident that had occurred three years earlier. (Exh. "C" – Ball Deposition at pp. 38-39.)

11.      Siple was demanding, uncooperative and domineering. (Exh. "C" – Ball Deposition at pp. 56.)

12.      Nurse Ball found Siple to be "less than forthcoming," and it was difficult for her to determine what drugs he was actually taking and where he was getting them from. (Exh. "C" – Ball Deposition at p. 33-34.)

13.     If an inmate at the Detention Center is detoxing from any medications, that inmate is immediately placed on a detox protocol and placed in an appropriate part of the jail. (Exh. "D" – Martin Deposition at pp. 13 and 16.)

14.     On March 25, 2011, the nurses determined that Siple was positive for substance abuse. (Exh. "C" – Ball Deposition at p. 26.)

15.     The nurses also determined that Siple had the potential for having withdrawal symptoms. (Exh. "C" – Ball Deposition at p. 39.)

16.     Based on the information Siple gave to the nurses about his drug use, Nurse Martin placed him on a detox protocol using the drug Vistaril.  (Exh. "C" – Ball Deposition at p. 88; Exh. "D" – Martin Deposition at p. 22.)

17.     Because Siple was withdrawing from prescription medication, he was transferred to C-Max, an area in the Detention Center where inmates with medical needs were housed. (Exh. "A" – Woods Declaration at ¶ 9.)

18.     Inmates in C-Max were kept under closer observation than inmates in the general population. (Exh. "A" – Woods Declaration at ¶ 10.)

19.     Detention Center officers checked on inmates in C-Max at least once every 30 minutes. (Exh. "A" – Woods Declaration at ¶ 11.)

20.     Pursuant to Nurse Martin's directive, Siple was transferred to medical segregation in C-Max at approximately 1:30 p.m. on March 25, 2013, his first full day in the Detention Center. (Exh. "A" – Woods Declaration at ¶ 12 and Declaration Exh. "4".)

21.     Nurse Williamson and Nurse Amy Stanphill administered the Vistaril required by the detox protocol to Siple on March 25, 26, 27 and 28. (Exh. "B" – Williamson Deposition at p. 66; Exh. "F" – Stanphill Deposition at pp. 22-23.)

22.    On March 28, 2011, Siple complained of back pain to Nurse Williamson. (Exh. "B" – Williamson Deposition at pp. 17 and 20-21.)

23.    Consistent with protocol, his back pain was treated with Naproxen and Motrin. (Exh. "B" – Williamson Deposition at p. 21.)

24.    At 7:04 p.m. on March 29, 2011, Siple complained of having seizures. (Exh. "A" – Woods Declaration at ¶ 13 and Declaration Exh. "5".)

25.    Nurse Melinda Grant arrived to examine Siple within two minutes, at 7:06 p.m. (Exh. "A" – Woods Declaration at ¶ 13 and Declaration Exh. "5".)

26.    Siple told Nurse Grant that he was going to have a seizure, but she found no signs or symptoms of him actually having a seizure. (Exh. "E" – Medical Records at p. 2.)

27.    Siple was in no apparent distress ("NAD") when Nurse Grant saw him on March 29, 2011. (Exh. "E" – Medical Records at p. 2.)

28.    Nurse Grant told Siple to calm down or he would be moved to the padded cell. (Exh. "E" – Medical Records at p. 2.)

29.    Nurse Grant instructed the deputy on duty that if Siple continued to have problems, he was to be placed in the padded cell for his safety. (Exh. "A" – Woods Declaration at ¶ 13 and Declaration Exh. "5".)

30.    At around 7:30 p.m. on March 29, 2011, Lieutenant Stanley Young and Staff Sergeant David Miller were making their rounds through the Detention Center when they were told by Deputy Travis Whitaker that Siple was acting out. (Exh. "H" – Miller Declaration at ¶ 5 and Declaration Exh. "1"; Exh. "I" – Miller Deposition at p. 11; Exh. "J" – Young Deposition at p. 14.)

31.     When Staff Sergeant Miller and Lieutenant Young arrived at his cell, Siple was being very boisterous and yelling. (Exh. "J" – Young Deposition at p. 16.)

32.     Siple did not look sick, and he did not appear to have any medical problem. (Exh. "H" – Miller Declaration at ¶ 7; Exh. "K" – Young Declaration at ¶ 5.)

33.     Staff Sergeant Miller and Lieutenant Young entered Siple's cell to talk with him and calm him down. (Exh. "H" – Miller Declaration at ¶ 8.)

34.     Staff Sergeant Miller and Lieutenant Young told Siple to sit down, and he sat down on his bed. (Exh. "H" – Miller Declaration at ¶ 9.)

35.     Siple began yelling that he was hungry and was going to "nut up." (Exh. "H" – Miller Declaration at ¶ 10.)

36.     "Nut up" is a term that inmates use when they intend to fight or otherwise become violent and disruptive. (Exh. "H" – Miller Declaration at ¶ 11.)

37.     Staff Sergeant Miller told Siple to calm down, but Siple did not comply. (Exh. "H" – Miller Declaration at ¶ 12.)

38.     Siple stated, "Get me the fuck out of here," and he came up off his bed in an aggressive manner. (Exh. "H" – Miller Declaration at ¶ 13; Exh. "J" – Young Deposition at pp. 19-20.)

39.     Siple was physically capable of threatening Staff Sergeant Miller and Lieutenant Young. (Exh. "H" – Miller Declaration at ¶ 14; Exh. "K" – Young Declaration at ¶ 6.)

40.     As Siple approached him, Staff Sergeant Miller grabbed him by the left arm and upper torso and took him to the ground. (Exh. "H" – Miller Declaration at ¶ 15.)

41.     After Staff Sergeant Miller took Siple to the ground, other officers responded to help, and Siple was handcuffed. (Exh. "J" – Young Deposition at p. 22.)

42.     As Nurse Grant had instructed, Siple was taken to the padded cell where he could be more closely monitored. (Exh. "J" – Young Deposition at pp. 22-23.)

43.     Nurse Grant was notified that Siple had been placed in the padded cell. (Exh. "H" – Miller Declaration at ¶ 16.)

44.     Nurse Grant evaluated Siple and found that he was uninjured. (Exh. "H" – Miller Declaration at ¶ 17; Exh. "J" – Young Deposition at p. 22.)

45.     Siple was transferred to the padded cell on March 29, 2011 at 7:52 p.m. (Exh. "A" – Woods Declaration at ¶ 18.)

46.     Siple had been in the padded cell less than 24 hours when he created another disturbance, which resulted in a second use of force against him.

47.     This incident began on March 30, 2011 around 6:15 p.m.  Lieutenant Young was making a check of the booking area where the padded cell is located. (Exh. "K" – Young Declaration at ¶ 9.)

48.     Siple was creating a disturbance by being loud and boisterous. (Exh. "K" – Young Declaration at ¶ 10.)

49.     Siple was also kicking and banging on the door of the padded cell. (Exh. "K" – Young Declaration at ¶ 11.)

50.     Lieutenant Young was concerned that if Siple were allowed to keep kicking the door, he might hurt himself.  (Exh. "K" – Young Declaration at ¶ 12.)

51.     Lieutenant Young was also concerned that Siple's behavior would disrupt the booking area. (Exh. "K" – Young Declaration at ¶ 14.)

52.    Consequently, Lieutenant Young determined that Siple should be restrained in a restraint chair until he calmed down so that he would not hurt himself by striking the interior of the cell. (Exh. "K" – Young Declaration at ¶ 15.)

53.    Lieutenant Young called for assistance and signaled for the restraint chair. (Exh. "K" – Young Declaration at ¶ 16.)

54.    Lieutenant Young instructed Siple to turn around and face the wall of the cell. (Exh. "K" – Young Declaration at ¶ 17.)

55.    Staff Sergeant Miller and several deputies arrived on the scene with the restraint chair. (Exh. "K" – Young Declaration at ¶ 18.)

56.    When the deputies entered the cell to escort Siple to the restraint chair, he turned around and became combative. (Exh. "K" – Young Declaration at ¶ 19.)

57.    Siple tried to push his way out of the cell. (Exh. "L" – Wilgocki Deposition at p. 19.)

58.    Siple actively resisted the deputies by swinging his arms. (Exh. "K" – Young Declaration at ¶ 20.)

59.    Siple was "swinging, pulling away and yelling." (Exh. "I" – Miller Deposition at p. 23.)

60.    Although Siple was eventually placed in the restraint chair, the deputies were not able to restrain him. (Exh. "K" – Young Declaration at ¶ 21.)

61.    Siple became more aggressive. (Exh. "K" – Young Declaration at ¶ 22.)

62.    Siple actively resisted when the deputies attempted to secure his restraints. (Exh. "K" – Young Declaration at ¶ 23.)

63.    Siple fought with the deputies, and was kicking, hitting, and spitting. (Exh. "M" – Crabb Deposition at p. 15; Exh. "N" – Deposition of Dustin Johnson at p. 13.)

64.    Staff Sergeant Miller was trying to restrain Siple's legs. (Exh. "H" – Miller Declaration at ¶ 21.)

65.    Siple intentionally kicked Staff Sergeant Miller in the lower back. (Exh. "H" – Miller Declaration at ¶ 22; Exh. "L" – Wilgocki Deposition at p. 23.)

66.    At this point, Lieutenant Young decided to use Oleoresin Capsicum (OC) pepper spray to subdue Siple. (Exh. "K" – Young Declaration at ¶ 25.)

67.    Lieutenant Young believed that Siple was going to hurt himself or one of the detention officers if the altercation continued. (Exh. "K" – Young Declaration at ¶ 26.)

68.    Lieutenant Young believed that the use of OC pepper spray was necessary to obtain Siple's compliance and to stop Siple's violent resistance. (Exh. "K" – Young Declaration at ¶ 27.)

69.    Lieutenant Young ordered his staff to step back, and he applied a short burst of OC pepper spray to Siple's face. (Exh. "K" – Young Declaration at ¶ 28.)

70.    Although Siple was sitting in the restraint chair when he was pepper-sprayed, he was not restrained. (Exh. "K" – Young Declaration at ¶ 31.)

71.    Siple's legs were free. (Exh. "H" – Miller Declaration at ¶ 23; Exh. "N" – Deposition of Dustin Johnson at p. 13.)

72.    Siple may have had one arm in a restraint, but the other arm was free. (Exh. "I" – Miller Deposition at p. 29; Exh. "N" – Johnson Deposition at p. 13.)

73.    If all the deputies had walked away, Siple could have gotten up and walked out. He wasn't cinched down or handcuffed. (Exh. "I" – Miller Deposition at p. 29.)

8

74.     When Siple was pepper-sprayed, he was outside of the padded cell. (Exh. "H" – Miller Declaration at ¶ 24.)

75.     After Siple was sprayed, he was removed from the restraint chair and briefly returned to the padded cell. (Exh. "H" – Miller Declaration at ¶ 25.)

76.     The detention officers on the scene were exposed to the OC pepper spray when Lieutenant Young used it and needed a few minutes to recover. (Exh. "H" – Miller Declaration at ¶ 27.)

77.     The officers also needed a few minutes to refocus after their struggle with Siple and to prepare to take him to the shower for decontamination. (Exh. "H" – Miller Declaration at ¶ 28.)

78.     Consequently, Siple was returned to the padded cell to allow the detention officers a chance to regroup. (Exh. "H" – Miller Declaration at ¶ 29.)

79.     According to Sheriff's Office policy, an inmate who has been subjected to the use of OC pepper spray should be allowed to apply cool water to his eyes and exposed skin in order to decontaminate and wash off the spray. (Exh. "A" – Woods Declaration at ¶ 25 and Declaration Exh. "6".)

80.     Detention Center staff decontaminate inmates who have been sprayed with OC pepper spray as soon as possible. (Exh. "K" – Young Declaration at ¶ 33.)

81.     After a few minutes, Siple was taken to the shower so that he could wash off and be decontaminated. (Exh. "H" – Miller Declaration at ¶ 30.)

82.     After Siple was showered, he was taken back to the padded cell. (Exh. "K" – Young Declaration at ¶ 34.)

83.     At this point he became combative again. (Exh. "K" – Young Declaration at ¶ 35.)

84.     Siple charged the door of his cell and escaped into the booking area. (Exh. "K" – Young Declaration at ¶ 36; Exh. "N" – Johnson Deposition at p. 21.)

85.     Siple struggled with the deputies in the booking area outside of his cell. (Exh. "K" – Young Declaration at ¶ 37; Exh. "I" –  Miller Deposition at p. 31; Exh. "N" – Johnson Deposition at p. 21; Exh. "M" – Crabb Deposition at p. 25; Exh. "L" – Wilgocki Deposition at p. 20.)

86.     During the struggle, the deputies had to take Siple to the ground and restrain him. (Exh. "K" – Young Declaration at ¶ 38.)

87.     The deputies eventually gained control of Siple and restrained him in the restraint chair. (Exh. "K" – Young Declaration at ¶ 40.)

88.     After Siple was returned to his cell, Nurse Grant was called to check on him. (Exh. "K"  – Young Declaration at ¶ 41.)

89.     Siple was uninjured when Nurse Grant checked on him after the events of March 30, 2011. (Exh. "K"  – Young Declaration at ¶ 42.)

90.     Nurse Williamson saw Siple on March 31, 2011 and gave him his medication. (Exh. "B" – Williamson Deposition at p. 66.)

91.     Nurse Ball examined Siple the next day, April 1, 2011. (Exh. "C" – Ball Deposition at p. 47.)

92.     On the morning of April 1, 2011, Siple was able to tell Nurse Ball his name. (Exh. "C" – Ball Deposition at pp. 47-48.)

93.    Siple stated that he was "in New England on a plane ride," but he was able to tell her that he was allergic to antihistamines. (Exh. "C" – Ball Deposition at pp. 49-50.)

94.    Siple's mental state that morning was "not quite clear, but clear." (Exh. "C" – Ball Deposition at p. 50.)

95.    Nurse Ball spoke with Dr. Williams about Siple. (Exh. "C" – Ball Deposition at p 53; Exh. "G" – Williams Deposition at p. 39.)

96.    Nurse Ball and Dr. Williams decided to treat Siple with Haldol and Cogentin. (Exh. "C" – Ball Deposition at pp. 53 and 77; Exh. "G" – Williams Deposition at p. 39.)

97.    When Nurse Ball checked on Siple later that day, he was cooperative and responded appropriately to her verbal directions. (Exh. "C" – Ball Deposition at p. 49.)

98.    Siple was behaving more appropriately and appeared to be clearing. (Exh. "C" – Ball Deposition at p. 89.)

99.    Siple took his medication on April 1, 2011. (Exh. "C" – Ball Deposition at p. 54.)

100.    Siple was checked by Nurse Ball several times on the evening of April 1, 2011, and he appeared to be fine. (Exh. "C" – Ball Deposition at p. 89.)

101.    Nurse Stanphill examined Siple on either April 2 or April 3, 2011. (Exh. "F" – Stanphill Deposition at pp. 35-36.)

102.    Nurse Stanphill was called to look at bruises on Siple's body. (Exh. "F" – Stanphill Deposition at pp. 6-7.)

103.    At the time of this examination, Siple was talking and responsive. (Exh. "F" – Stanphill Deposition at p. 38.)

104.    Siple did not need any medical attention from Nurse Stanphill. (Exh. "F" – Stanphill Deposition at p. 42.)

105.    Nurse Lily Brantley, who replaced Nurse Martin as Southern Health Partners' Medical Team Administrator, examined Siple on Monday, April 4, 2011. (Exh. "O" – Brantley Deposition at p. 13.)

106.    Siple complained that his foot was hurting. (Exh. "O" – Brantley Deposition at p. 13.)

107.    Nurse Brantley noted that the foot was bruised, but not swollen. (Exh. "O" – Brantley Deposition at p. 13.)

108.    Siple was in no acute distress when Nurse Brantley examined him on April 4, 2011. (Exh. "O" – Brantley Deposition at p. 28.)

109.    Siple spoke to Nurse Brantley about his foot for some time. (Exh. "O" – Brantley Deposition at p. 27.)

110.    Siple died unexpectedly on April 5, 2011.

111.    Siple was seen on the morning of April 5, 2011 at 10:00 a.m. by Nurse Williamson. (Exh. "B" – Williamson Deposition at p. 23.)

112.    At the time, Siple was lying supine in his cell and had not eaten his breakfast. (Exh. "B" – Williamson Deposition at p. 23.)

113.    Nurse Williamson attempted to take Siple's temperature, but he would not open his mouth to let her do so. (Exh. "B" – Williamson Deposition at p. 25.)

114.    Nurse Williamson took an axillary temperature. (Exh. "B" – Williamson Deposition at p. 25.)

115.    Siple's axillary temperature was low, but it is normal for an axillary temperature to be low. (Exh. "B" – Williamson Deposition at p. 25.)

116.   Nurse Williamson was unable to take Siple's blood pressure, but she was able to take his blood sugar, which was "medium high." (Exh. "B" – Williamson Deposition at pp. 25-26.)

117.   Siple's respiration was 24, which was normal. (Exh. "B" – Williamson Deposition at p. 47.)

118.   During the examination, Siple was responsive to Nurse Williamson, but not verbally. (Exh. "B" – Williamson Deposition at p. 27.)

119.   After she examined Siple, Nurse Williamson notified Nurse Brantley. (Exh. "B" – Williamson Deposition at p. 27.)

120.   The nurses decided to monitor Siple's condition. (Exh. "B" – Williamson Deposition at p. 29.)

121.   Nurse Williamson saw Siple again at approximately 11:20 a.m. (Exh. "B" – Williamson Deposition at p. 30.)

122.   At that time, Siple was sitting upright in his cell. (Exh. "B" – Williamson Deposition at p. 30.)

123.   Siple was eating without assistance. (Exh. "B" – Williamson Deposition at p. 30.)

124.   Sometime between noon and 1:00 p.m., Nurse Williamson's shift ended. (Exh. "B" – Williamson Deposition at p. 81.)

125.   On her way home Nurse Williamson went by Siple's cell to check on him one more time. (Exh. "B" – Williamson Deposition at pp. 80-81.)

126.   Siple was awake and alert at the time. (Exh. "B" – Williamson Deposition at p. 81.)

127.    At 1:30 p.m. Nurse Brantley and Nurse Hannah Cheek examined Siple again. (Exh. "O" – Brantley Deposition at p. 14; Exh. "P" – Cheek Deposition at p. 27.)

128.    Siple was sitting up in his cell. (Exh. "O" – Brantley Deposition at p. 14; Exh. "P" – Cheek Deposition at pp. 24-25 and 42.)

129.    Nurse Cheek recalls that Siple was not communicating verbally, but would shake his head "yes" or "no" to her questions. (Exh. "P" – Cheek Deposition at p. 25.)

130.    The nurses took Siple's vital signs. (Exh. "O" – Brantley Deposition at p. 14; Exh. "P" – Cheek Deposition at p. 25.)

131.    Nurse Cheek thought that Siple might be dehydrated, and she decided to send him to the emergency room for an evaluation. (Exh. "P" – Cheek Deposition at p. 25.)

132.    Detention Center personnel must be notified whenever an inmate needs to leave the Detention Center for medical treatment. (Exh. "A" – Woods Declaration at ¶ 22.)

133.    Sometime between 1:35 and 1:45 p.m., Nurse Cheek notified Staff Sergeant April March that Siple needed to be transported to the emergency room for an evaluation. (Exh. "P" – Cheek Deposition at pp. 48-49; Exh. "Q" – March Declaration at 3.)

134.    Siple was stable at the time. (Exh. "P" – Cheek Deposition at pp. 29-30.)

135.    Nurse Cheek believed it was appropriate to transport Siple to the emergency room using a Sheriff's Office patrol car rather than an ambulance. (Exh. "P" – Cheek Deposition at p. 29.)

136.    Staff Sergeant March immediately contacted the Sheriff's Office's Transportation Division to arrange for Siple to go to the hospital for his evaluation. (Exh. "Q" – March Declaration at ¶ 5.)

137.    Staff Sergeant March told Deputy Maria Fowler that Siple needed to be transported. (Exh. "Q" – March Declaration at ¶ 6.)

138.    Deputy Fowler paged Staff Sergeant Mikell Stewart, the officer in charge of the Transportation Division. (Exh. "Q" – March Declaration at ¶ 8; Exh. "R" – Stewart Deposition at p. 22.)

139.    Staff Sergeant Stewart received the page at approximately 2:00 p.m., and he, Staff Sergeant March, and several deputies proceeded to the padded cell to prepare Siple for transport. (Exh. "S" – Stewart Declaration at ¶ 4.)

140.    Because Siple was confined to the padded cell, he was dressed in a suicide smock, not an orange inmate uniform. (Exh. "A" – Woods Declaration at ¶ 18.)

141.    It is not standard practice at the Detention Center to transport inmates wearing a suicide smock. (Exh. "R" – Stewart Deposition at p. 26.)

142.    Inmates are typically nude under the smock, and it does not necessarily stay on well when they are moved. (Exh. "R" – Stewart Deposition at p. 26.)

143.    In addition, Staff Sergeant Stewart noted that Siple smelled strongly of urine and body odor. (Exh. "R" – Stewart Deposition at p. 36.)

144.    Staff Sergeant Stewart thus decided to give Siple a shower and dress him in an orange uniform before taking him to the hospital. (Exh. "R" – Stewart Deposition at pp. 54-55.)

145.    Staff Sergeant Stewart did not want an inmate to be naked in public. (Exh. "R" – Stewart Deposition at p. 55.)

146.    Staff Sergeant March agreed that Siple should be given a shower and dressed in a uniform for his own dignity. (Exh. "Q" – March Declaration at ¶ 10.)

147.    In an emergency situation, Staff Sergeant Stewart would have taken Siple directly to the hospital without showering him or changing him into a uniform. (Exh. "S" – Stewart Declaration at ¶ 6.)

148.    The nurse had not indicated that Siple had a medical emergency, and Siple did not appear to be in need of emergency medical treatment. (Exh. "Q" – March Declaration at ¶¶ 4 and 11; Exh. "S" – Stewart Declaration at ¶ 5.)

149.    When Staff Sergeant Stewart and the others arrived, Siple was sitting up in his cell. (Exh. "Q" – March Declaration at ¶ 12; Exh. "S" – Stewart Declaration at ¶ 7.)

150.    Siple had his lunch tray, and he had been eating. (Exh. "Q" – March Declaration at ¶ 13; Exh. "S" – Stewart Declaration at ¶ 8.)

151.    Staff Sergeant Stewart entered the cell and told Siple to stand up, because they were going to the hospital to get him checked out. (Exh. "S" – Stewart Declaration at ¶ 9.)

152.    Siple verbally told Staff Sergeant Stewart that he did not want to go to the hospital. (Exh. "S" – Stewart Declaration at ¶ 10.)

153.    Siple walked on his own toward the shower. (Exh. "R" – Stewart Deposition at p. 33; Exh. "T" – Price Deposition at p. 28.)

154.    At one point, Siple began walking quickly, and Staff Sergeant Stewart told him to slow down. (Exh. "R" – Stewart Deposition at p. 33.)

155.    When he was almost to the shower, Siple fell down, and the deputies on the scene had to pull him into the shower. (Exh. "R" – Stewart Deposition at pp. 33 and 35.)

156.    Once Siple was placed in the shower, he got up on his own accord. (Exh. "R" – Stewart Deposition at p. 35.)

157.    Staff Sergeant Stewart became concerned that Siple's condition might be an emergency as opposed to a non-emergency, so he went to talk to Nurse Brantley about the situation. (Exh. "R" – Stewart Deposition at p. 37.)

158.    Siple eventually stood in the shower.  However, he had trouble standing and was "a little shaky." (Exh. "T" – Price Deposition at p. 15.)

159.    At one point, Siple fell forward toward the shower wall and caught himself. (Exh. "T" – Price Deposition at pp. 35-36.)

160.    When Siple was done showering, the deputies on the scene helped him sit down and tried to help him dress. (Exh. "T" – Price Deposition at p. 15.)

161.    At about 2:20 in the afternoon, and Nurse Brantley arrived on the scene to check on Siple. (Exh. "O" – Brantley Deposition at p. 21.)

162.    Siple did not respond verbally when Nurse Brantley checked him, but he blinked his eyes when she shined a light in them. (Exh. "O" – Brantley Deposition at pp. 23-24.)

163.    Nurse Cheek arrived about five minutes later. (Exh. "P" – Cheek Deposition at p. 49.)

164.    Nurse Cheek noted that Siple's pulse was very faint. (Exh. "P" – Cheek Deposition at p. 49.)

165.    Siple's condition had declined since Nurse Cheek had seen him earlier. (Exh. "P" – Cheek Deposition at p. 51.)

166.    At that point, Nurse Cheek determined that Siple needed to be transported to the hospital via ambulance rather than by a patrol car. (Exh. "P" – Cheek Deposition at p. 51.)

167.    Nurse Cheek then notified Staff Sergeant March that Siple needed to go to the hospital by ambulance. (Exh. "Q" – March Declaration at ¶ 15.)

168. Staff Sergeant March asked what was wrong. Nurse Cheek walked away briefly, returned and said that Siple was in and out of consciousness. (Exh. "Q" – March Declaration at ¶ 16.)

169. Staff Sergeant March immediately called Gold Cross EMS and asked for an ambulance. (Exh. "Q" – March Declaration at ¶ 17.)

170. Nurse Cheek noted that Siple's pulse had stopped, and the nurses called for the automated external defibrillator ("AED"). (Exh. "P" – Deposition of Hannah Cheek at pp. 52-53.)

171. The AED could not find a rhythm to shock, so Nurse Cheek started CPR. (Exh. "P" – Deposition of Hannah Cheek at p. 54.)

172. Meanwhile, Staff Sergeant March called Gold Cross again and told them to "step it up." (Exh. "Q" – March Declaration at ¶ 19.)

173. Nurse Cheek was tired, so Staff Sergeant March took over performing CPR on Siple. (Exh. "Q" – March Declaration at ¶ 20.)

174. Staff Sergeant March continued giving Siple chest compressions until Gold Cross arrived. (Exh. "Q" – March Declaration at ¶ 21.)

175. Regional Medical Examiner Daniel K. Brown, M.D. performed an autopsy on Siple's body on April 6, 2011. (Exh. "U" – Brown Deposition at p. 11.)

176. Dr. Brown determined that the cause of Siple's death was hypertensive cardiovascular disease. (Exh. "U" – Brown Deposition at p. 71.)

177. Siple had an enlarged heart. (Exh. "U" – Brown Deposition at pp. 14-16.)

178. The walls of Siple's left ventricle were thicker than normal. (Exh. "U" – Brown Deposition at p. 17.)

18

179.    Dr. Brown's opinion is that it is likely that Siple died from an arrhythmia caused by the enlargement of his heart muscle. (Exh. "U" – Brown Deposition at pp. 102-03.)

180.    Siple's death was not the result of any trauma that was inflicted upon him. (Exh. "U" – Brown Deposition at p. 94.)

181.    The use of OC pepper spray against Siple did not cause or contribute to Siple's death. (Exh. "U – Brown Deposition at pp. 94-95.)

182.    Siple's death was a natural death. (Exh. "U" – Brown Deposition at pp. 93-94.)

183.    Sheriff Whittle had no knowledge that Siple needed medical attention that he was not receiving. (Exh. "V" – Whittle Declaration at ¶ 9.)

184.    It is the policy of the Columbia County Sheriff's Office to use an ambulance service to transport inmates requiring immediate care. (Exh. "A" – Woods Declaration at ¶ 26 and Declaration Exh. "7".)

185.    There is no evidence that Sheriff Whittle acted with willfulness, malice, or corruption.

186.    Sheriff Whittle took no action at all with regard to Siple. (Exh. "V" – Whittle Declaration at ¶ 10.)

187.    Sheriff Whittle was not aware that Siple was an inmate at the Detention Center until after Siple had died. (Exh. "V" – Whittle Declaration at ¶ 7.)

188.    Sheriff Whittle was not aware of any specific medical need that Siple might have had, and he was not directly involved in any decision regarding Siple's medical care. (Exh. "V" – Whittle Declaration at ¶ 8.)

189.    Neither Staff Sergeant March nor Staff Sergeant Stewart believed that Siple was experiencing a medical emergency when he was taken from the padded cell to be showered. (Exh. "Q" – March Declaration at ¶ 11; Exh. "S" – Stewart Declaration at ¶ 12.)

190.    In order to make sure that Detention Center inmates have access to appropriate medical care, the County has contracted with Southern Health Partners. (Exh. "V" – Whittle Declaration at ¶ 3.)

191.    Pursuant to official policy, inmates are screened regarding a number of medical issues immediately upon their arrival at the Detention Center. (Exh. "A" – Woods Declaration and Declaration Exh. "7".)

192.    The policy requires that immediate health needs be identified and addressed. (Exh. "A" – Woods Declaration and Declaration Exh. "7".)

193.    The policy requires health care personnel to respond to a medical emergency with proper equipment when needed. (Exh. "A" – Woods Declaration and Declaration Exh. "7".)

194.    If an inmate requires emergency care, the policy states that "the inmate will be transported to one of any local emergency care facilities based on the need of the inmate as determined by qualified health care staff or on scene Emergency Medical Technician." (Exh. "A" – Woods Declaration and Declaration Exh. "7".)

195.    If an inmate requires monitoring or immediate care during transport, the policy requires that an ambulance service be used for the transport. (Exh. "A" – Woods Declaration and Declaration Exh. "7".)

196.    If an inmate requires "urgent but not immediate care" the policy allows for the Transportation Division to take the inmate for treatment. (Exh. "A" – Woods Declaration and Declaration Exh. "7".)

20

197.    The custom of the Columbia County Sheriff's Office is to provide adequate medical care to all inmates in the Detention Center. (Exh. "V" – Whittle Declaration at ¶ 4.)

198.    No policy or custom of the Sheriff's Office contributed to any violation of Siple's constitutional rights.

199.    At all times relevant to the plaintiffs' claims against him, Sheriff Whittle was acting within in his capacity as the Sheriff of Columbia County. (Exh. "V" – Whittle Declaration at ¶ 2.)

200.    Deputy Travis Whitaker was not working at the Detention Center on March 30, 2011. (Exh. "W" – Whitaker Declaration at ¶ 7.)

201.    Deputy Travis Whitaker was not involved in any use of force against Siple that took place on March 30, 2011. (Exh. "W" – Whitaker Declaration at ¶ 8.)

202.    The use of OC pepper spray against Siple on March 30, 2011 was done in a good faith effort to restore order within the Detention Center.

203.    Lieutenant Young did not use his OC pepper spray simply for the purpose of causing harm to Siple. (Exh. "K" – Young Declaration at ¶ 29.)

204.    Lieutenant Young used OC pepper spray in an effort to restore order after Siple had violently resisted the detention officers on the scene and kicked Staff Sergeant Miller. (Exh. "K" – Young Declaration at ¶ 30.)

205.    Siple was not returned to the padded cell to cause him unnecessary harm. (Exh. "H" – Miller Declaration at ¶ 26.)

206.    Any force used against Siple after he was showered and became combative a second time on March 30, 2011, was done for the legitimate purpose of subduing him and returning him to his cell. (Exh. "K" – Young Declaration at ¶ 39.)

207.    At all times relevant to the plaintiffs' claims against them, Lieutenant Young, Staff Sergeant Miller, Deputy Smith and Deputy Whitaker were acting within their capacities as employees of the Columbia County Sheriff's Office. (Exh. "K" – Young Declaration at ¶ 3; Exh. "H" – Miller Declaration at ¶ 3; Exh. "W" – Whitaker Declaration at ¶ 3; Exh. "X" – Smith Declaration at ¶ 3.)

208.    Neither Lieutenant Young, Staff Sergeant Miller, Deputy Smith nor Deputy Whitaker had any evidence or information before him that would suggest that his actions with regard to Siple violated any of Siple's constitutional rights. (Exh. "K" – Young Declaration at ¶¶ 7 and 44; Exh. "H" – Miller Declaration at ¶¶ 18 and 31; Exh. "W" – Whitaker Declaration at ¶ 6; Exh. "X" – Smith Declaration at ¶¶ 6 and 9.)

209.    The Sheriff's Office has adopted a written Use of Force policy. (Exh. "A" – Woods Declaration at ¶ 25 and Declaration Exh. "6".)

210.    Pursuant to this policy, the use of OC pepper spray is authorized in the Detention Center when an inmate assaults or threatens imminent assault of any person. (Exh. "A" – Woods Declaration at ¶ 25 and Declaration Exh. "6".)

211.    An inmate who has been subjected to the use of OC pepper spray should be allowed to apply cool water to his eyes and exposed skin in order to decontaminate and wash off the spray. (Exh. "A" – Woods Declaration at ¶ 25 and Declaration Exh. "6".)

212.    The Sheriff's Office does not have a policy or custom of using OC pepper spray, or any other type of force, in an unconstitutional manner. (Exh. "V" – Whittle Declaration at ¶ 6.)

213.    The Columbia County Sheriff's Office contracts with Southern Health Partners, Inc. to provide medical care for inmates in the Detention Center. (Exh. "A" – Woods Declaration at ¶ 22.)

214.    All of the nurses who treated Siple during his confinement at the Detention Center were employees of Southern Health Partners. (Exh. "A" – Woods Declaration at ¶ 23.)

This 15th day of August, 2013.

/s/ Thomas L. Cathey

Thomas L. Cathey
Georgia Bar No. 116622

James B. Ellington
Georgia Bar No. 243858

Attorneys for Defendants Columbia County, Georgia; Clay Whittle, individually and in his official capacity as Sheriff for Columbia County; Stanley Young, individually and in his official capacity; Travis Smith, individually and in his official capacity; Travis Whitaker, individually and in his official capacity; and David Miller, individually and in his official capacity

Of Counsel:
Hull Barrett, PC
Post Office Box 1564
Augusta, GA  30903-1564
706-722-4481
706-722-9779 (facsimile)
jellington@hullbarrett.com
tcathey@hullbarrett.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the foregoing **Statement of Undisputed Material Facts** with the Clerk of Court using the CM/ECF system and served upon counsel of record by electronic filing, as follows:

Scott C. Crowley
CROWLEY MCKOON
P.O. Box 190
Fortson, Georgia 31808
(706) 324-4375

Bobby L. Scott
Fischer Scott, LLC
P.O. Box 2726
Columbus, Georgia 31902

Donnie Dixon
Donnie Dixon Attorney at Law, LLC
24 Drayton Street, Suite 1000
Savannah, GA 31401

Shira Adler Crittendon
Michael D. Flint
Laura L. Broome
FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, GA 30339-5948

This 15th day of August, 2013.

/s/ Thomas L. Cathey
Thomas L. Cathey