IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

WENDY ANDERSON, as             *
Administrator of the Estate    *
of John Wayne Siple, et al.,   *
                               *
        Plaintiffs,            *
                               *
    v.                         *        CV 112-031
                               *
COLUMBIA COUNTY, GEORGIA,      *
et al.,                        *
                               *
        Defendants.            *

_____

**O R D E R**

_____

Presently pending before the Court are Plaintiffs Wendy Anderson and Sharon Siple's motions to strike (doc. nos. 60, 61), Defendant Southern Health Partners, Inc.'s motion to strike (doc. no. 50) and motion for summary judgment (doc. no. 51), and Defendants Columbia County, Georgia, Clay Whittle, Stanley Young, Travis Smith, Travis Whitaker, David Miller, and unknown jail staff members' motion for summary judgment (doc. no. 52). Upon consideration of the record evidence, the briefs submitted by counsel, and the relevant law, Southern Health Partner's motion to strike (doc. no. 50) is **GRANTED**. Plaintiffs' motions to strike the testimony of Dr. Wilcox (doc. no. 60) and Dr. Broadwater (doc. no. 61) are **DENIED AS MOOT**. Defendants' motions for summary judgment (doc. nos. 51, 52) are **GRANTED**.

## I. BACKGROUND

### A. Factual Background

This case arises out of the incarceration and death of John Wayne Siple ("Siple") in the Columbia County Detention Center ("CCDC") during the spring of 2011.

### 1. *Siple's Arrest, Booking, and Intake Screening*

Siple was arrested on March 24, 2011, and charged with Felony Manufacturing of Marijuana and Possession of Marijuana with Intent to Distribute. (Doc. no. 55, Ex. 1 at 5.) He was booked into the CCDC around midnight. (Id. at 1.) According to County policy, a deputy jailer completed a medical intake screening form during the booking process. (Id. at 2.) During the booking process, Siple indicated that he was currently taking Percocet and Xanax. (Id. at 11.)

The next morning, Siple was seen by Nurse Elizabeth Ball, a mental health nurse, and Nurse Alicia Martin, Southern Health Partners, Inc.'s ("SHP")[1] Medical Team Administrator. (Ball Dep. at 26.) During the examination, Siple said that he would have a seizure if he was not given something for Xanax withdrawal. (Id.) He admitted to doctor shopping to obtain drugs. (Id. at 37.) He also indicated that he was taking pain medication due to a motor vehicle accident that had occurred three years earlier. (Id. at 38-39.) Siple was demanding, uncooperative, and domineering. (Id.

---

[1]  SHP is a third-party healthcare provider that contracts with CCDC to provide medical care for inmates.  SHP has a staff of nurses and physicians that evaluate, monitor, and treat the inmates' medical needs. (Id. at 4.)

at 56.) Nurse Ball found him to be "less than forthcoming," and it was difficult for her to determine what drugs he was actually taking, in what amounts, and where he was getting them. (Id. at 33-34.) Despite his lack of assistance, it was determined that Siple was positive for substance abuse and thus had the potential for having withdrawal symptoms. (Id. at 26, 39.) Consequently, Siple was placed on a detoxification protocol using the drug Vistaril.[2] (Id. at 88; Martin Dep. at 22.) He was then transferred to medical segregation in C-Max, an area of the CCDC where inmates with medical needs are housed,[3] at approximately 1:30 p.m. on March 25, 2011. (Doc. no. 55, Ex. 1 at 2.)

### 2. Siple's Medical Care in C-Max

Nurses Jo Williamson and Amy Stanphill administered Vistaril to Siple according to the detox protocol on March 25, 26, 27, and 28. (Williamson Dep. at 66; Stanphill Dep. at 22-23.) His vital signs – including heart rate, blood pressure, respiration, and temperature – were also taken daily. (Doc. no. 55, Ex. 5 at 12.) Siple's vital signs appeared "fairly stable" according to Dr. Robert Williams, a physician with SHP. (Williams Dep. at 31.)

However, on March 28, 2011, Siple complained of back pain to Nurse Williamson. (Williamson Dep. at 17, 20-21.) This was treated with Naproxen and Motrin, consistent with protocol. (Id.

---

[2] Vistaril is a medication used for people with anxiety, panic attacks, or withdrawal from medications. (Williams Dep. at 36.)

[3] Inmates in C-Max are kept under closer observation than inmates housed in general population. (Doc. no. 55, Ex. 1 at 2.) CCDC officers check on inmates in C-Max at least once every thirty minutes. (Id.)

3

at 21.)  The next evening, Siple appeared agitated and complained of seizures.  (Doc. no. 55, Ex. 1 at 15.)  Nurse Melinda Grant evaluated Siple but found no signs or symptoms consistent with him having a seizure.  (Doc. no. 55, Ex. 5 at 2.)  She instructed Siple that he needed to calm down or he would be placed in a padded cell. (Id.)

### 3.  *Siple's First Disturbance Requiring Use of Force*

Shortly after being seen by Nurse Grant, Siple became boisterous and began to shout.  (Young Dep. at 14.)  Lieutenant Stanley Young and Staff Sergeant David Miller were notified and responded to Siple's cell.  (Id.)  They entered his cell to talk to him and to try to calm him down.  (Id. at 17.)  Siple told the officers that he was going to "nut up in here",[4] that he hadn't eaten, and that he was tired of being in "this f---ing cell."  (Id. at 19.)  Miller told Siple to calm down, but he did not comply. (Miller Decl. ¶ 12.)  Instead, Siple stated, "get me the f--k out of here," and came up off his bed in an aggressive manner.  (Id. ¶ 13.)  Young testified that Siple "bolted from the bed and tried to take off his shirt as he was trying to engage us."  (Young Dep. at 20.)  Miller grabbed Siple by the left arm and upper torso and took him to the ground.  (Miller Decl. ¶ 15.)  Soon after, other officers responded to help restrain Siple.  (Young Dep. at 22.)  He

---

[4] "Nut up" is a term that inmates use when they intend to fight or otherwise become violent and disruptive.  (Miller Decl. ¶ 11.)  Lieutenant Young further explained that it means that inmates are "going to trash the cell, or possibly cause injury to themselves by kicking and running their head into the door, and breaking sprinkler heads, and just being disruptive." (Young Dep. at 19-20.)

was handcuffed and then taken to the padded cell,[5] per Nurse Grant's instructions. (Id.) She was notified and examined Siple, concluding that he was uninjured. (Miller Decl. ¶¶ 16-17.)

### 4. *Siple's Second Disturbance Requiring Use of Force*

The next day, March 30, Lieutenant Young was performing his routine check of the booking area where the padded cell is located. (Young Decl. ¶ 9.) Siple was being loud and boisterous. (Id. ¶ 10.) He was also kicking and banging on the door of the padded cell. (Id. ¶ 11.) Young became concerned that if Siple continued this behavior he would injure himself and disrupt the booking area. (Young Dep. at 47; Young Decl. ¶ 14.) Consequently, he determined that Siple should be placed in a restraint chair until he calmed down. (Id. ¶ 15.)

Lieutenant Young signaled for the restraint chair and called for assistance. (Young Dep. at 46.) He then instructed Siple to turn around and face the wall of the cell. (Id. at 49.) When the deputies entered the cell to escort Siple to the restraint chair, "he turned around and started resisting in an attempt not to be placed in that chair." (Id.) He started "swinging and pulling away and yelling." (Miller Dep. at 23.) While struggling with Siple, the officers managed to place him into the restraint chair, but they could not secure him. (Young Dep. at 49.) At most, Siple

---

[5] The padded cell is located in the booking area of the CCDC. (Doc. no. 55, Ex. 1 at 2.) Inmates are placed in the padded cell to prevent them from injuring themselves. (Id. at 3.) Its walls, floor, and door are padded with a thick rubber surface. (Id.) CCDC personnel in the booking area have a clear view into the cell and can keep a close watch on inmates placed therein. (Id.)

had one arm in a restraint, but it is unclear whether that restraint was secured.   (Young Dep. at 50; Miller Dep. at 29; Johnson Dep. at 13; Crabb Dep. at 19.)   Staff Sergeant Miller explained that "[i]f all the deputies would have walked away, [Siple] could have got up and walked out. He wasn't cinched down or handcuffed." (Miller Dep. at 29.)

At this point, Siple became more aggressive. (Young Decl. ¶ 22.)   He actively resisted the deputies' attempts to secure the restraints.   (Id. ¶ 23.)   He fought with the deputies and was kicking, hitting, and spitting. (Crabb Dep. at 15; Johnson Dep. at 13.)   As Staff Sergeant Miller was attempting to restrain his legs, Siple kicked Miller in the back. (Miller Dep. at 25; Young Dep. at 49.)   Unable to subdue Siple, and concerned for the welfare of both his deputies and Siple himself, Lieutenant Young decided to use pepper spray to subdue Siple.   (Young Dep. at 51.)   He believed that the use of pepper spray was necessary to obtain Siple's compliance and to stop Siple's violent resistance. (Young Decl. ¶ 27.)   Young then ordered his deputies back and applied a two to three second burst of the spray. (Miller Dep. at 25.)

After Siple was sprayed, the deputies temporarily returned him to his cell. (Id. at 29-30.) The deputies that were attempting to subdue Siple were also exposed to the pepper spray and needed a few minutes to recover. (Id. at 30.) After approximately five minutes, Siple was removed from his cell and taken to the shower to

be decontaminated.[6]  (Miller Decl. ¶ 30.)  Deputies then attempted
to return Siple to the padded cell.  (Young Decl. ¶ 34.)  However,
he again became combative, charging the door of his cell and
escaping into the booking area.  (Id. ¶ 36.)  He struggled with the
deputies in the booking area outside his cell before the deputies
were eventually able to subdue him.  (Id. ¶ 38.)  This time, the
deputies were able to secure Siple in the restraint chair and
returned him to his cell.  (Id. ¶ 41.)  Subsequently, Nurse Grant
examined Siple and concluded that he was uninjured.  (Id. ¶ 42.)

### 5.  Siple's Medical Care from March 31 through April 4, 2011

Nurse Williamson examined Siple on March 31, 2011, and gave
him his medication pursuant to his detoxification protocol.
(Williamson Dep. at 66.)  The next morning, Nurse Ball evaluated
Siple.  (Ball Dep. at 47-48.)  She described Siple's mental state
that morning as "not quite clear, but clear."  (Id. at 50.)  Siple
was able to tell her his name, but he claimed that he was "in New
England on a plane ride."  (Id. at 49-50.)  Consequently, she spoke
with Dr. Williams and they agreed that Siple should be treated with
Haldol and Cogentin.[7]  (Id. at 53, 77; Williams Dep. at 39.)  When
Nurse Ball checked on Siple later that day, he was cooperative,
responded to her directions, and appeared to be clearing.  (Ball

---

[6] Decontamination involves applying cool water to eyes and skin exposed
to the spray. (Doc. no. 55, Ex. 1 at 17.)
[7] Haldol is generally prescribed for agitation. "It can help someone
to either calm down or clear." (Ball Dep. at 77.)  Cogentin mitigates any
potential side effects that may occur from Haldol. (Id.)

Dep. at 49, 89.)  She checked on Siple several more times on the evening of April 1, 2011, and he appeared to be fine.  (Id. at 89.)

Although Nurse Stanphill recalls examining Siple on either April 2 or 3, 2011, there is no record that Siple's vital signs were checked on those days.  (Stanphill Dep. at 35-36.)  Siple had complained of bruising on his body.  (Id. at 6-7.)  During her examination, he was talking and responsive.  (Id. at 38.)  She determined that he was not in need of any medical attention.  (Id. at 42.)  Nurse Lily Brantley examined Siple on April 4, 2011. (Brantley Dep. at 13.)  Siple complained that his foot was hurting. (Id.)  Nurse Brantley noted that his foot was bruised, but not swollen.  (Id.)  She concluded that Siple was not in any acute distress.  (Id. at 28.)

### 6. *Siple's Medical Care on April 5, 2011*

On the morning of his death, Siple was seen by Nurse Williamson at approximately 10:00 a.m.  (Williamson Dep. at 23.) Siple was lying down in his cell and had not eaten his breakfast. (Id.)  Unable to take his temperature because he would not open his mouth, Nurse Williamson took an axillary temperature.  (Id. at 25.) It was low.[8]  (Id.)  She was also unable to take Siple's blood pressure.  (Id.)  However, she was able to take his blood sugar, which was "medium high," and his respirations were "normal."  (Id. at 25-26, 47.)  During the examination, Siple was responsive, but not verbally.  (Id. at 27.)

---

[8]  Axillary temperatures generally run lower than temperature's measured orally.  (Id.)

After the examination, Nurse Williamson notified Nurse Brantley, and they decided to monitor Siple's condition. (Id. at 29.) Deputy Freeman also observed Siple that morning. (Freeman Dep. at 18.) Although he was only with Siple for a few minutes, he noted that Siple did not verbally communicate with him and was unable to physically sit up. (Id. at 19.) Based on this, he told Nurse Brantley that Siple "didn't look good."[9] (Id. at 21.) In his deposition, Freeman testified that he thought Siple should have been taken to the hospital "or something." (Id. at 40.)

Nurse Williamson evaluated Siple again at 11:20 a.m. (Williamson Dep. at 30.) He was sitting upright in his cell and eating without assistance. (Id. at 30.) She checked on him again between noon and 1:00 p.m. (Id. at 80-81.) At 1:30 p.m., Nurse Brantley and Nurse Hannah Cheek examined Siple. (Brantley Dep. at 14; Cheek Dep. at 27.) He was sitting up, was responsive, but could not communicate verbally and looked pale. (Id.; Cheek Dep. at 24-25.) Believing Siple was possibly dehydrated, they took his vital signs and Nurse Cheek determined that he needed to go to the hospital for evaluation. (Cheek Dep. at 25.)

County policy requires that CCDC personnel be notified whenever an inmate needs to be transported for medical treatment. (Doc. no. 55, Ex. 1 at 3.) Immediately following their 1:30 p.m. evaluation of Siple, Nurse Cheek notified Staff Sergeant April March that Siple needed to be transported to the hospital for an

---

[9] Other deputies noted that Siple "appear[ed] frail," had "lost some weight," and looked "lethargic." (Stewart Dep. at 15-16.)

evaluation.   Because Siple was stable at the time, Nurse Cheek believed it was appropriate to transport him via patrol car rather than an ambulance.   (Cheek Dep. at 29.)    Staff Sergeant March immediately contacted Deputy Maria Fowler with the Sheriff's Office Transportation Division to arrange for Siple's transport.   (March Decl. ¶ 5.)    Fowler paged Staff Sergeant Stewart at approximately 2:00 p.m. and Stewart, along with Staff Sergeant March and several others, proceeded to the padded cell to prepare Siple for transport.   (Stewart Decl. ¶ 4.)

Staff Sergeant Stewart was told only that Siple needed to be transported to the hospital for an evaluation.   (Stewart Dep. at 24-25.)    Stewart believed this meant for a mental evaluation because "[a]ny time we're told evaluation, it typically means mental evaluation."   (Id. at 25.)    Additionally, because Siple was confined to the padded cell, he was dressed in a suicide smock and not the standard inmate uniform.   (Id. at 26.)    It is not standard practice to transport inmates wearing a suicide smock because they are typically nude underneath, and it does not stay on well when they are moved.   (Id.)    Moreover, Siple "reeked" of urine and body odor.   (Id. at 36.)    Thus, Stewart decided to have Siple shower and to dress him in an orange inmate uniform before taking him to the hospital.   (Id. at 54-55.)

Siple was sitting up in his cell when Staff Sergeant Stewart and the others arrived.   (Stewart Decl. ¶ 7.)    Stewart entered the cell and told Siple to stand up as they were taking him to the

hospital for evaluation.  (Id. ¶ 9.)  Siple told Stewart that he did not want to go to the hospital.  (Id. ¶ 10.)  Stewart told Siple that he was going to the hospital anyway and that he could refuse treatment when he got there if he wanted to.  (Id. ¶ 11.) Siple was escorted to a shower near his cell.  (Price Dep. at 29-30.)  Siple walked on his own toward the shower.  (Stewart Dep. at 33.)  At one point he began walking quickly and Stewart had to tell him to slow down.  (Id.)  And then he became "passive[ly] resistant" and "felt like [he was] tugging away."  (Id. at 35.)

When he was almost in the shower, Siple fell down and the deputies had to pull him into the shower.  (Id.)  Once Siple was placed in the shower, he got up under his own strength.  (Id.)  At some point, Siple began crawling around the shower.  (Id.)  Staff Sergeant Stewart immediately became concerned that Siple's condition might be more serious than had originally been communicated.  (Id. at 37.)  He told the other deputies to get Siple dressed and he went to talk with Nurse Brantley.  (Id.) Nurse Brantley told Stewart that Siple's condition was an emergency and that he needed to be transported by ambulance.  (Id. at 38.) Stewart called for an ambulance.  (Id.)

Nurse Brantley immediately went to check on Siple.  (Brantley Dep. at 21.)  Siple was not verbally responsive.  (Id. at 23-24.) Nurse Cheek arrived a few minutes later.  (Cheek Dep. at 49.)  She examined Siple's vital signs and noted that Siple's pulse was very faint.  (Id. at 49.)  She also concluded that Siple's condition had

destabilized and that he needed emergency transport to the hospital. (Id. at 51.) Staff Sergeant March immediately called Gold Cross EMS and requested an ambulance. (March Decl. ¶ 17.) Various nurses and county personnel continued to tend to Siple. (Cheek Dep. at 52-53.) When Nurse Cheek discovered that Siple no longer had a pulse, she called for the automated external defibrillator ("AED"). (Id.) Unable to find any heartbeat, Nurse Cheek started performing CPR. (Id. at 54.) Meanwhile, March called for an ambulance again and told them to "step it up." (March Decl. ¶ 19.) When Nurse Cheek became tired, March took over performing CPR and continued until the ambulance arrived. (Id. ¶¶ 20-21.) Siple was transported by ambulance to Doctor's Hospital where he was pronounced dead at 3:44 p.m.

### 7. Autopsy Results

Regional Medical Examiner Daniel K. Brown, M.D., performed an autopsy on Siple's body on April 6, 2011. (Brown Dep. at 11.) Dr. Brown determined that the cause of death was hypertensive cardiovascular disease. (Id. at 71.) His report indicated that Siple had an enlarged heart and the walls of his left ventricle were thicker than normal. (Id. at 16, 17.) It was his opinion that Siple died as a result of an arrhythmia caused by the enlargement of his heart. (Id. at 102-03.)

### B. Procedural History

Plaintiffs filed suit in this Court on March 2, 2012. (Doc. no. 1.) On August 15, 2013, SHP filed a motion for summary

judgment (doc. no. 51) concurrent with a motion to strike the testimony of Plaintiffs' expert, Dr. Harlan South ("Dr. South") (doc. no. 50). That same day, Defendants Columbia County, Clay Whittle, Stanley Young, Travis Smith, Travis Whitaker, David Miller, and unknown jail staff members (collectively "the County Defendants") filed their motion for summary judgment. (Doc. no. 52.) Also on August 15, 2013, Plaintiffs filed motions to strike the testimony of SHP's expert, Dr. Todd Wilcox ("Dr. Wilcox"), and the County Defendants' expert, Dr. Stephen Broadwater ("Dr. Broadwater"). (Doc. nos. 60, 61.) The parties have briefed the pending motions, which are ripe for adjudication. The Court will address the motions to strike prior to resolving the motions for summary judgment.


## II. MOTIONS TO STRIKE

As explained above, there are three motions to strike presently pending before the Court. The Court will present the controlling standard, analyze SHP's arguments to exclude Dr. South's testimony, and address Plaintiffs' arguments to strike the testimony of Dr. Wilcox and Dr. Broadwater, in that order.

### A. Standard for Expert Testimony

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods of the facts of the case.

"As the Supreme Court recognized in Daubert v. Merrell Dow Pharms., Inc., [509 U.S. 579 (1993)], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of scientific testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003). The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. Id. Specifically, the court must consider whether:

> (1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1340-41. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). A witness's qualifications must correspond to the subject matter of his proffered testimony. See Jones v. Lincoln Elec. Co.,

188 F.3d 709, 723 (7th Cir. 1999). However, an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case. Id.; see also McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004) ("The proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline."); Goforth v. Paris, No. 5:02-CV-94, 2007 WL 988733, at *3 (M.D. Ga. March 30, 2007) ("[M]ost courts conclude that a general practitioner can offer expert testimony concerning medical conditions routinely treated by specialists."). "Thus, if there are gaps in an expert witness's qualifications or knowledge, they generally go to the weight of the witness's testimony, not its admissibility."[10] Trilink Saw Chain, LLC, 583 F. Supp. 2d at 1304 (internal quotations and punctuation omitted).

Additionally, Georgia law imposes competency requirements above and beyond the Federal Rules of Evidence.[11] O.C.G.A. § 24-7-

---

[10]    "In fixing the requisite level of knowledge, skill, experience, training or education an expert witness must possess, courts are called upon to balance the advantages and disadvantages of expert testimony. On one hand, allowing only the most qualified witnesses to serve as experts reduces the risk a jury will overvalue the opinions of a minimally-qualified witness simply because the witness was classified as an expert by the court. On the other hand, requiring stellar qualifications of all witnesses could unnecessarily deprive the jury of helpful testimony based upon minor shortcomings in a witness's qualifications. As a result, courts liberally construe a witness's qualifications in favor of expert status and consider gaps in a witness's qualifications a matter for the jury to consider in determining what weight to give to the testimony." Goforth, 2007 WL 988733, at *3 (M.D. Ga. March 30, 2007).

[11]    The Eleventh Circuit has stressed "that when determining the competency of an expert witness in state medical malpractice claims, federal courts first should apply the competency standard under state law." Dukes v. Georgia, 428 F. Supp. 2d 1298, 1313 (N.D. Ga. 2006) (citing McDowell, 392 F.3d at 1294-95).

702(c) provides that an expert testifying to the appropriate standard of care must have:

> actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in (A) the active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently[.]

O.C.G.A. § 24-7-702(c)(2)(A). Further, subsection (D) provides that "an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised taught or instructed nurses . . . has knowledge of the standard of care of that health provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider." Id. § 24-7-702(c)(2)(D).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. There are four factors that courts should consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained

16

general acceptance in the relevant community. <u>Id.</u> at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." <u>United States v. Frazier</u>, 387 F.3d 1244, 1262 (11th Cir. 2004). Thus, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." <u>Daubert</u>, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's notes (2000 amendment). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, neither an expert's qualifications and experience alone, nor his unexplained assurance that his or her opinions rely on accepted principles is sufficient. <u>McClain v. Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1244 (11th Cir. 2005); <u>Frazier</u>, 387 F.3d at 1261. Moreover, when analyzing a witness's

reliability, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate. Daubert, 509 U.S. at 595.

Third, expert testimony must assist the trier of fact to decide a fact in issue. Thus, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Frazier, 387 F.3d at 1262; Daubert, 509 U.S. at 591. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. Further, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

## B. Dr. South

Dr. South is Plaintiffs' expert as to both standard of care and causation. He opined that SHP's nurses breached the standard of care by improperly monitoring his withdrawal symptoms, not timely providing Siple with emergency treatment, and not communicating the urgency of his condition with a physician. (Doc. no. 76, Ex. 2 "South Report" at 3.) According to Dr. South, this breach exacerbated Siple's hypertensive cardiovascular disease leading to his cardiac arrest and death. (Id.)

SHP, however, argues that Dr. South's testimony should be excluded because: (1) Dr. South is not qualified to offer expert testimony regarding the standard of care in a correctional

facility; (2) Dr. South is not qualified to offer expert testimony regarding the standard of care in developing, implementing, and evaluating a proper withdrawal protocol; (3) Dr. South is not qualified to testify as to Siple's cause of death; and (4) Dr. South's testimony is not reliable because he does not present any discernible methodology for his determinations that SHP breached the standard of care and that the withdrawal protocol exacerbated Siple's heart condition causing his premature death.

### 1. Dr. South's Qualifications

The Court finds that Dr. South is qualified as an expert to discuss matters relating to the standard of care relevant both to nurses in correctional facilities and the implementation and evaluation of withdrawal protocols.   Further, Dr. South is qualified as an expert to testify regarding the cause of Siple's death.

Dr. South is a board certified internist with over sixteen years of experience and is currently in practice at North Fulton Internal Medicine Group, where he has served since 2009.   (Doc. no. 1, Ex. 1 at 8.)   Dr. South practiced in varying capacities at Martin Army Community Hospital in Fort Benning, Georgia, serving as a staff internist from 1999-2002 as well as Chief of both the Coumadin Clinic and Medical Specialty Services from 2002-2004. (Id. at 7.)   From 2004-2009, he served as a staff internist at D.D. Eisenhower Army Medical Center at Fort Gordon, Georgia, before transitioning to his current practice outside Atlanta, Georgia.

(Id. at 8.)   Dr. South was also a Colonel in the Army Reserves, where he served as a battalion surgeon in Ramadi, Iraq, from 2005-2006.   (Id.)   He is currently a member of the Air Force Reserves, a fellow of the American College of Physicians, and has hospital privileges at North Fulton Regional Hospital in Roswell, Georgia. (Id.)

SHP first objects that Dr. South is not qualified as an expert to testify to the requisite standard of nursing care in a correctional facility because he has never treated an inmate, he is not a member of any organizations devoted to correctional care, and he has no experience, training, or continuing medical education classes in correctional health care.   SHP, however, has not cited a single case where a district court excluded an otherwise qualified physician on the basis that he had not practiced in the correctional setting.   Indeed, the Eleventh Circuit rejected a similar argument in McDowell.   Like SHP, the defendant healthcare provider argued that the plaintiff's experts should be excluded because their "lack of experience in working in a jail render[ed] [their] opinion unqualified."   392 F.3d at 1296.   The Eleventh Circuit disagreed, explaining that "[t]he standard of care applicable to nurses is universal, and does not diminish when the setting is a jail rather than hospital."   Id.   Accordingly, it held the experts were competent to render opinions as to the applicable standard of care.

SHP argues that a nuanced reading of <u>McDowell</u> suggests an opposite result in this case.[12]   Latching onto the Court's language that the defendant "has not given us a reason to differentiate between jail nurses and hospital nurses[,]" <u>McDowell</u>, 392 F.3d at 1296, SHP contends that Georgia's 2005 tort reform bill (including O.C.G.A. § 24-7-702(c)) and subsequent case law provides this Court the reason that the Eleventh Circuit lacked to differentiate between jail and hospital nurses.   Specifically, SHP argues that correctional medicine is an "area of practice or specialty" under O.C.G.A. § 24-7-702(c) due to the unique challenges and procedures faced by correctional practitioners.   SHP cites two cases that purportedly support a finding that correctional medicine is its own specialty under Georgia law.   See <u>Dukes</u>, 428 F. Supp. 2d 1298; <u>Goforth</u>, 2007 WL 988733, at *1.   In <u>Dukes</u>, the district court appeared to distinguish between medical and administrative specialties.   The court highlighted the plaintiff's expert's credentials in the "field of correctional medicine," most notably eleven years serving as a *consultant* in the design, management, and quality improvement of correctional health care systems.   428 F. Supp. 2d at 1313 (emphasis added).   However, the court was careful not to conflate the expert's administrative expertise with medical treatment, noting that he had not provided "hands-on medical treatment to any inmates" in over twenty years.   <u>Id.</u>   Although the

---

[12]   This argument does not appear in SHP's motion to exclude the testimony of Dr. South, but rather in its response in opposition to Plaintiffs' motion to exclude the testimony of Dr. Wilcox.   (<u>See</u> Doc. no. 66 at 3.)

court held that the expert was qualified to "discuss *matters of correctional health*," nowhere did it reference any standard of care unique to correctional medicine. <u>Id.</u> (emphases added).

Likewise, in <u>Goforth</u>, the district court did not find that correctional medicine was a *medical* specialty thereby altering or imposing a unique standard of care. At best, it recognized correctional medicine as an *administrative* specialty, finding the proffered witness qualified to "discuss policy drafting and administration in a correctional setting[.]" 2007 WL 988733 at *5. Additionally, the court's discussion of the witness's qualifications further undercuts SHP's arguments. Despite being a pediatric specialist, and not an internist, hepatologist, or epidemiologist, and not directly caring for a patient "in some time," the court found the witness was qualified as an expert to discuss the standard of care in treating Hepatitis C. <u>Id.</u> Rather than bolstering SHP's argument to exclude Dr. South's testimony, <u>Goforth</u> supports a more relaxed inquiry into Dr. South's qualifications in correctional medicine.[13]

_____

[13]   SHP also cites to <u>Aguilar v. Children's Healthcare of Atlanta, Inc.</u>, 320 Ga. App. 663 (2013) ("To permit even a veteran general practitioner to judge the performance of a specialist, including decisions concerning either procedures or referrals, would eviscerate the statute's purpose of assuring that a medical professional is not held negligent in the absence of evidence that he violated a standard of care established by his peers."). First, neither this quote nor case demonstrates in any way that correctional medicine is a cognizable medical specialty. Indeed, <u>Aguilar</u> did not involve any issue related to correctional medicine. Second, even assuming it did, the facts are easily distinguishable from those here. The proposed witness claimed to be qualified to testify regarding the standard of care when intubating infants in an emergent situation despite spending "only 30 days a year in a rotation through the department of emergency medicine" during his residency and having no experience intubating patients in his one year of experience outside of residency. 320 Ga. App. at 664-65.

22

These cases suggest, and the Court does not disagree, that the correctional setting imposes certain challenges and *administrative* procedures not faced in other settings. However, the Court remains unpersuaded that correctional medicine is a *medical* specialty thereby requiring the exclusion of Dr. South. Accordingly, the Court finds that Dr. South is qualified to render an expert opinion as to the relevant standard of care in the CCDC.

Second, SHP objects that Dr. South is not qualified to offer expert testimony regarding the standard of care in treating a patient suffering from withdrawal.[14] Specifically, SHP argues that Dr. South's experience with patient withdrawal is limited to refilling patients' prescriptions and does not include tailoring and evaluating patient-specific withdrawal protocols. A review of Dr. South's testimony, however, demonstrates just the opposite.

Dr. South testified that in his current practice he has treated,

> at least 20 patients who, you know, who appeared with specifically more benzodiazepine withdrawal, you know, who come in and who have been on them, reportedly on these medications and have not been on them for several days *or* ran out of medicines that have come in to see me, you know, for a routine refill.

(South Dep. at 22) (emphasis added). This testimony does not reflect that Dr. South's sole experience with treating patients

---

[14] SHP contests Dr. South's qualifications to render expert testimony regarding treatment of patient's suffering from withdrawal only under Daubert, and not under O.C.G.A. § 24-7-702(c). (See Doc. no. 50, Ex. 1 at 3-4.)

suffering from withdrawal is limited to routine refills. Rather, it includes refills within a broader experience of treatment.

Further, Dr. South testified that during his time at Martin Army Community Hospital and D.D. Eisenhower Army Medical Center, he treated between 25 and 35 patients suffering from withdrawal symptoms, including benzodiazepines.[15]   (Id. at 9-11.)   More importantly, when asked whether he had any protocols in place for treating these patients, he responded, "I don't have a specific, you know, protocol.  You know, I sort of tailor it for each patient depending on their usage and how much they have used before." (Id. at 22-23.)    Thus, it is evident that Dr. South has the very experience that SHP claims he lacks, namely, assessing withdrawal patients' condition and developing a protocol tailored to the patients' demonstrated needs.  Accordingly, Dr. South is qualified to render an expert opinion on the standard of care in developing, implementing, and assessing proper withdrawal protocols for detoxing patients.

Third, SHP argues that Dr. South is not qualified to testify about Siple's cause of death.  Siple's autopsy revealed that he died as a result of hypertensive cardiovascular disease.  (Id. at 90.)  Dr. South opined that this condition was "exacerbated by the Xanax withdrawal" leading to Siple's rapid deterioration and ultimate death.  (Id. at 91.)  SHP contends that because Dr. South is an internist, and not a pathologist, cardiologist, or

---

[15]  Xanax is a benzodiazepine.

toxicologist, he is not qualified to render an expert opinion on causation.

Yet, SHP has not cited any authority requiring Dr. South to be either a specialist in cardiology, pathology, or toxicology to render him an expert as to causation. Indeed, the proper inquiry is not whether Dr. South is a board certified specialist, but whether Dr. South is qualified to render an expert opinion as to the effects that Xanax withdrawal can have on the cardiovascular system. The Court is satisfied that he is.

As described above, the Court has already recognized Dr. South's expertise in treating patients suffering from withdrawal. His testimony revealed an understanding of the chemical properties of Xanax as well as the symptoms and side effects associated with patient detoxification. (Id. at 51-55.) Further, Dr. South has professional experience and knowledge in evaluating stressors impacting the heart. He testified that in his current practice, he does "a lot of [his] own cardiac evaluation and care within the office" including both chemical and treadmill heart stress tests. (Id. at 107.) He also performs heart ultrasounds and echocardiograms as a regular part of his practice. (Id.) Under Daubert, this is sufficient to qualify Dr. South as an expert on the possible effects Xanax withdrawal can have on the cardiovascular system.

### 2. Reliability of Dr. South's Testimony

SHP also contends that Dr. South's testimony is not reliable. Specifically, SHP claims that Dr. South did not provide any discernible methodology for his conclusions that SHP breached the standard of care and that Siple's hypertensive cardiovascular disease was exacerbated by his withdrawal treatment or lack thereof. In response, Plaintiffs argue that Dr. South's testimony *on causation* is reliable because it is "supported by his training and experience as well as his notations to medical texts including Harrison's treatise on internal medicine and a Mayo Clinic publication." (Doc. no. 65 at 7.)

However, Plaintiffs offer no argument as to why Dr. South's opinion that the nurses breached the standard of care is reliable. Moreover, Dr. South himself did not provide a basis or reason for his opinion that SHP breached the standard of care in either his expert report or his deposition.[16] All the Court is presented with is Dr. South's opinion that SHP breached the standard of care. (See South Report at 123-25; South's Dep. at 45-48, 50-51, 63, 66, 71-72, 80, 84-85.) Dr. South provides no quantitative or qualitative support for his conclusions. He does not reference any specific experiences or materials upon which he relied in reaching his conclusions. To find Dr. South's opinion testimony reliable as Daubert requires, this Court would need to take a leap of faith and

---

[16] Federal Rule of Civil Procedure 26(a)(2)(B) provides that the expert report must contain "a complete statement of all opinions the witness will express and *the basis and reasons for them.*" (emphasis added).

rely on Dr. South's *ipse dixit* opinion. However, "[r]eliance on naked assurances of the purported expert is exactly what the Eleventh Circuit in Cook and McClain warned against." Dukes, 428 F. Supp. 2d. at 1315.

Even assuming Dr. South's conclusions were based on his experience training and supervising nurses, the result remains the same. When a witness relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." See Frazier, 387 F.3d at 1261. Dr. South has not provided any such explanation. "Accepting [Dr. South's] experience alone as evidence of the reliability of his statements is tantamount to disregarding entirely the reliability prong of the Daubert analysis." Dukes, 428 F. Supp. 2d at 1315.

Therefore, the Court is unable to find that Dr. South's opinions regarding the standard of care set forth in his expert report are sufficiently reliable.[17] Accordingly, this testimony is excluded under Rule 702, and SHP's motion to strike (doc. no. 50) is **GRANTED**.

### C. Dr. Wilcox

SHP presents Dr. Wilcox as an expert in its defense of Plaintiffs' medical malpractice claim. Because the Court excluded Dr. South's opinion regarding the standard of care, Plaintiffs

---

[17] The Court does not analyze the reliability of Dr. South's testimony regarding causation.

cannot establish either the appropriate standard of care or that such standard was breached by SHP – elements necessary for Plaintiffs' medical malpractice claim. See Smith v. Am. Transitional Hosps., Inc., 330 F. Supp. 2d 1358, 1361 (S.D. Ga. 2004). Accordingly, Plaintiffs' motion to strike the testimony of Dr. Wilcox (doc. no. 60) is **DENIED AS MOOT**.

### D. Dr. Broadwater

Dr. Broadwater is the County Defendants' expert in their defense of Plaintiffs' wrongful death and deliberate indifference claims. Because the County Defendants' motion for summary judgment is decided on other grounds, Plaintiffs' motion to strike the testimony of Dr. Broadwater (doc. no. 61) is **DENIED AS MOOT**.

### E. Request for a Hearing

Plaintiffs requested a Daubert hearing to present arguments on the three motions to strike. SHP and the County Defendants opposed Plaintiffs' request. District courts are under no obligation to hold Daubert hearings. See Cook, 402 F.3d at 1113 (Although "a Daubert hearing before the trial court might have given [plaintiff] an additional opportunity to meet [its] burden . . . the trial court was under no obligation to hold one."); see also United States v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001) ("Daubert hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses." (internal quotations omitted)); Placida Prof. Cntr., LLC v. F.D.I.C., 512 Fed. Appx. 938, 954 (11th Cir. 2013) (Plaintiff "was given adequate

opportunity" to meet its burden through its witness's expert report, legal memorandum in response to defendant's motion to exclude, and a submitted expert affidavit.).

The Court does not believe that the <u>Daubert</u> issues presented necessitate a hearing. The issues surrounding Dr. South were not overly complicated, and Plaintiffs had an adequate opportunity to show that Dr. South's testimony satisfied the requirements of Rule 702, <u>Daubert</u>, and its progeny. Consequently, Plaintiffs' requests for a hearing (doc. nos. 60, 61) are **DENIED**.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." <u>U.S. v. Four Parcels of Real Prop.</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp., 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a

30

directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiffs notice of the motions for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. nos. 58, 59.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  The time for filing materials in opposition has expired, and the motions are now ripe for consideration.

**B. Analysis**

Plaintiffs brought suit pursuant to 42 U.S.C. § 1983 against the County Defendants for deliberate indifference to Siple's serious medical needs and excessive force.  They also brought pendant state law claims against the County Defendants for wrongful

death and excessive force, as well as a medical malpractice claim against SHP. Plaintiffs also seek an award of punitive damages and attorneys' fees. In response, both SHP and the County Defendants filed motions for summary judgment. The Court will first address SHP's motion and the state medical malpractice claim before turning to the remaining claims against the County Defendants.

### 1. SHP's Motion for Summary Judgment

SHP seeks summary judgment on Plaintiffs' medical malpractice claim, arguing that Plaintiffs have failed to produce competent medical expert testimony establishing that SHP did not meet the requisite standard of care and that SHP proximately caused Siple's death.

Because the Court exercised supplemental jurisdiction over Plaintiffs' medical malpractice claim, Georgia law governs. McDowell, 392 F.3d at 1295 (citing Smith v. Am. Transitional Hosps., Inc., 330 F. Supp. 2d 1358, 1361 (S.D. Ga. 2004)). "In Georgia, a plaintiff must show the following to prove a medical malpractice claim: (1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." Smith, 330 F. Supp. 2d at 1361 (internal quotations omitted) (citing Zwiren v. Thompson, 276 Ga. 498 (2003)).

"Expert testimony is required to provide a 'standard measure' to be used by the jury in 'measuring the acts of a [health care

provider] to determine whether he exercised a reasonable degree of care and skill; the jury is not permitted to set up and use any arbitrary or artificial standard of measurement." Id. (citing Hayes v. Brown, 108 Ga. App. 360 (1963)); see also Zwiren, 276 Ga. at 500 (stating that a plaintiff must use an expert to prove causation in a medical malpractice action). Therefore, to prove medical malpractice in this case, Plaintiffs must present competent expert testimony that SHP's nursing staff breached the applicable standard of care and that this breach proximately caused Siple's death. "This requisite subsumes the burden of providing expert testimony as to what the applicable standard of care is." Id.

As discussed above, the Court excluded Dr. South's testimony regarding the relevant standard of care on the basis that Plaintiffs failed to show that it was sufficiently reliable. Without this testimony, Plaintiffs have failed to establish that a question of fact exists as to an essential element of their medical malpractice claim. SHP, therefore, is entitled to judgment as a matter of law. Accordingly, SHP's motion for summary judgment (doc. no. 51) is **GRANTED**.

### 2. County Defendants' Motion for Summary Judgment

The County Defendants seek summary judgment on Plaintiffs' (a) wrongful death claim, (b) § 1983 claim for deliberate indifference, (c) § 1983 claim for excessive force, and (d) derivative claims for punitive damages and attorneys' fees.

33

### a. Wrongful Death Claim

Plaintiffs' Complaint alleged a state law claim for wrongful death against Columbia County and Sheriff Whittle in both his official and individual capacities.   However, Plaintiffs concede that summary judgment is appropriate for Columbia County as it is entitled to sovereign immunity.   (See Doc. no. 69 at 2.)   Summary judgment is therefore also proper for Plaintiffs' claim against Sheriff Whittle in his official capacity.   See Banks v. Happoldt, 271 Ga. App. 146, 147 (2004) (Sovereign immunity "protects county employees who are sued in their *official* capacities." (emphasis in original)) (citing Cameron v. Lang, 274 Ga. 122, 126 (2001)).   With regard to their claim against Sheriff Whittle in his individual capacity, Plaintiffs alleged that Sheriff Whittle failed to provide Siple with proper medical treatment when presented with actual knowledge that he was in need of medical attention resulting in his death.[18]   (Compl. ¶ 36.)   The County Defendants argue that Sheriff Whittle is entitled to official immunity under Georgia law.

"Under the doctrine of official, or qualified, immunity, law enforcement officers may be personally liable for negligent actions taken in the performance of ministerial functions, but are immune from personal liability for discretionary acts taken within the scope of their official authority and performed without

---

[18]   In their brief, Plaintiffs argue that Sheriff Whittle is liable pursuant to O.C.G.A. § 42-5-2(a) for his failure to provide Siple food. (Doc. no. 69 at 6.)   However, Plaintiffs' Complaint did not include any such claim for wrongful death, and  Plaintiffs have failed to properly amend their Complaint.   "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."   Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004).

34

willfulness, malice or corruption." <u>Cameron</u>, 274 Ga. at 123. "Stated succinctly, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure." <u>Graham v. Cobb Cnty.</u>, 316 Ga. App. 738, 742 (2012). Whether a duty is ministerial or discretionary turns on the character of the specific act. <u>Reed v. DeKalb Cnty.</u>, 264 Ga. App. 83, 86 (2003). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." <u>Harvey v. Nichols</u>, 260 Ga. App. 187, 191 (2003). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." <u>Id.</u>

Under Georgia law, "[t]he provision of adequate medical attention . . . is a ministerial act by the sheriff . . . and is not subject to . . . official immunity. In contrast, the determination of *what* medical treatment to provide *is* an act of discretion subject to official immunity." <u>Graham</u>, 316 Ga. App. at 742-43 (emphasis in original) (holding that sheriff was entitled to official immunity where inmate suffering from alcohol withdrawal died from liver disease allegedly caused by sheriff's failure to adequately treat and timely transport inmate to hospital for emergency treatment). Here, it is beyond dispute that Siple received medical care during his incarceration. He was examined

35

regularly by nurses, placed on a detoxification protocol, and provided with various medications. (Doc. no. 55, Ex. 1 at 1-3.) On the day of his death, Siple was seen by the nursing staff no fewer than five times. (Williamson Dep. at 23-27, 30, 80-81; Cheek Dep. at 27.) As in Graham, Plaintiffs simply dispute *what* medical care Siple should have been given. This determination is a discretionary act for which Sheriff Whittle is entitled to official immunity absent a showing of willfulness, malice, or corruption.

Plaintiffs state that they "have alleged facts set forth in other sections of [their] brief showing that Sheriff Whittle acted with deliberate intention to harm John Wayne Siple."[19] (Doc. no. 69 at 3.) The Court, however, is unable to locate these facts. Indeed, the record reflects that Sheriff Whittle was unaware that Siple was an inmate at the CCDC until after Siple died. Thus, he could not be aware that Siple was in need of medical attention that he was not receiving. (Whittle Decl. ¶¶ 7, 9.) Clearly, these facts fall far short of showing willfulness, malice, or corruption.[20] Consequently, Sheriff Whittle is entitled to official

---

[19] To the extent Plaintiffs challenge Sheriff Whittle's actions as a policymaker, they must show that he acted with malice to overcome the protections of official immunity. Slaughter v. Dooly Cnty., No. 5:06-CV-143, 2007 WL 2908648, at *14 (M.D. Ga. 2007) ("[E]nactment of jail policies and the training and supervision of [jail] employees are clearly discretionary acts.") As discussed below, Plaintiffs have failed to present any facts demonstrating malice.

[20] Curiously, Plaintiffs cite Wendelken v. JENK LLC, 291 Ga. App. 30 (2008), in support of their argument that a question of fact exists as to Sheriff Whittle's malice toward Siple. However, the Georgia Court of Appeals reversed the determination of the trial court and granted the defendants' motion for summary judgment because the plaintiffs failed to point to "specific evidence in the record" demonstrating malice or a deliberate intention to do wrong. Id. at 32.

36

immunity and the County Defendants' motion for summary judgment on Plaintiffs' wrongful death claim is **GRANTED**.

### b. Deliberate Indifference Claim

Plaintiffs' Complaint also alleges that Columbia County and Sheriff Whittle were deliberately indifferent to Siple's serious medical needs under 42 U.S.C. § 1983. A § 1983 claim is predicated on an alleged violation of an underlying constitutional right. "As a pre-trial detainee, [Siple's] rights exist[ed] under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment . . . . Nonetheless, [Siple's] claims are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009) (internal citation omitted). "To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Id. at 1306-07. The County Defendants do not appear to dispute that Siple had a serious medical need. Thus, the first inquiry is whether Columbia County was deliberately indifferent to Siple's serious medical need.

### 1. Columbia County

To show Columbia County's deliberate indifference, Plaintiffs must present a policy or custom that deprived Siple of his constitutional rights. "[L]iability under § 1983 may not be based

on the doctrine of respondeat superior." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003). "It is only when the 'execution of the government's policy[21] or custom[22] . . . inflicts the injury' that the municipality may be held liable." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). "Because municipalities rarely have an official policy that endorses a constitutional violation, [a § 1983 plaintiff] must show that [the municipality] had a custom or practice of permitting it and that [the municipality's] custom or practice was the moving force behind the constitutional violation." Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (internal quotations omitted).

"Demonstrating a policy or custom requires showing a persistent and wide-spread practice." Goebert, 510 F.3d at 1332 (internal quotation omitted); see also Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011) ("A pattern of similar constitutional violations . . . is ordinarily necessary."). Thus, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality." Craig, 643 F.3d at 1310 (quoting City of Okla. City v. Tuttle, 471 U.S. 808, 841 (1985)). "This requirement of proof prevents the imposition of liability based upon an isolated incident and ensures that a municipality is held

---

[21]    "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997).

[22]    "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." Goebert v. Lee Cnty., 510 F.3d 1312, 1332 (11th Cir. 2007).

liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Id. (internal quotations and citations omitted). "In the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff[] must show that the policy itself is unconstitutional." Id. at 1311 (quoting Estate of Novack ex rel. Turbin v. Cnty. of Wood, 226 F.3d 525, 531 (7th Cir. 2000)).

Additionally, the custom or policy must have been "taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences." Davis v. DeKalb Cnty. Sch. Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2000). Where the plaintiff claims that a facially constitutional action violated his constitutional rights, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee[s]." Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 405 (1997). "To meet this burden, a plaintiff must demonstrate that the lawful action was taken with deliberate indifference as to its known or obvious consequences." McDowell, 392 F.3d at 1291 (quoting Brown, 520 U.S. at 415). "Plainly stated, a showing of simple or even heightened negligence is not enough." Id.

Plaintiffs argue that Siple's constitutional rights were violated by three Columbia County policies and customs: (1) a

39

custom of refraining from using EMS transport because of the cost and suspicion of inmates "faking" their medical needs ("alleged transport custom"); (2) a custom of showering inmates who have a medical emergency before transporting them to the hospital ("alleged showering custom"); and (3) a policy whereby Columbia County abdicated its responsibility to provide medical care to inmates.

To demonstrate the alleged transport custom, Plaintiffs rely on the testimony of Nurse Martin. According to her testimony, shortly after she was hired she was told that she "was sending too many inmates out through the ambulance services, that if it was not an emergency, they could be sent out by a deputy patrol car." (Martin Dep. at 30.) Nurse Martin agrees that when she first started working at the CCDC she was sending some inmates to the hospital via EMS who could have gone by patrol car instead. (<u>Id.</u> at 56.) She explained that she was new to working in a jail environment and "didn't know how manipulative inmates can be and how they would want to get sent out just to leave the facility." (<u>Id.</u> at 28.) Some inmates would fake problems in order to "get attention from the nurse." (<u>Id.</u> at 31–32.) According to Nurse Martin, inmates that she sent to the hospital via EMS "were getting sent right back" with "no diagnosis or anything wrong with them." (<u>Id.</u> at 32, 47.)

At some point, Sheriff Whittle approached Nurse Martin about this situation. He instructed her "to make sure that [she was]

monitor[ing] the inmates more - or observe their symptoms more close[ly], and if it was something that could be done over the phone by the doctor to try to do that. And it wasn't necessarily not to send them out. It was not to send them out via EMS. It was to send them out via the patrol car." (Id. at 53-54.) However, Sheriff Whittle was clear that if there was an emergency to call 911 for EMS transport. (Id.) Plaintiffs argue that this testimony establishes a custom whereby Columbia County refrained from using EMS transport for inmates with emergent medical needs due to costs and a suspicion that they were faking their injuries and that this custom contributed to Siple's death. The Court disagrees.

A custom must be such "a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991). Failing to point to a single other inmate whose constitutional rights were violated by the alleged transport custom, Plaintiffs have not shown the requisite pattern or wide- spread practice necessary to establish the existence of a custom. Thus, even assuming Siple's constitutional rights were violated, the record demonstrates that this was an isolated incident, which is insufficient to prove a policy or custom. See McDowell, 392 F.3d at 1290 (county entitled to summary judgment because plaintiff could not point to another occasion "when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated

41

an inmate's medical condition); <u>Goebert</u>, 510 F.3d at 1332 (sheriff received summary judgment where plaintiff did not show that any other inmate's constitutional rights were violated); <u>Craig</u>, 643 F.3d at 1312 (county's third party healthcare provider was entitled to summary judgment because plaintiff "failed to present any evidence of a series of constitutional violations from which deliberate indifference can be inferred"). Consequently, Plaintiffs have failed to establish the existence of an unconstitutional transport custom.

However, even assuming they could establish a custom whereby Columbia County was refraining from using EMS transport when the inmates, in fact, were in need of emergency treatment, Plaintiffs have not shown that such a custom was the "moving force" behind Siple's injury. Nurse Martin testified that she did not think that Siple was "faking" or simply trying to get her attention. (Martin Dep. at 32.) Rather, she did not send Siple to the hospital because "his vital signs were normal . . . . he was not having any sweating. He wasn't grabbing his chest. You know, I asked, you know, the simple question, can you tell me what's wrong with you And he told me that he just was not feeling well." (<u>Id.</u> at 50.) Her decision not to transport Siple was based on her observations, medical findings, and Siple's vital signs – not any alleged transport custom. Moreover, Nurse Cheek (who later made the decision to send Siple to the hospital) believed it was appropriate to transport him via patrol car because "he was stable at the

42

time." (Cheek Dep. at 30.) Plaintiffs have not presented any evidence of a causal connection between the alleged transport custom and Siple's death.

Next, Plaintiffs argue that Siple's constitutional rights were violated by Columbia County's alleged showering custom. They contend that the decision to shower Siple before transporting him to the hospital resulted in a delay in him receiving emergency treatment which constituted deliberate indifference to his medical needs. This argument, however, suffers from the same fatal defect as the first; namely, Plaintiffs fail to establish the existence of any custom of showering inmates in need of emergency treatment. Moreover, the record does not support Plaintiffs' assertion that Columbia County was deliberately indifferent to Siple's medical needs.

Plaintiffs have not established the existence of any custom of showering inmates in need of emergency treatment before transporting them to the hospital. According to Staff Sergeant Stewart, it is standard practice to have inmates dressed in "inmate orange" prior to transport. (Stewart Dep. at 55.) Showering inmates, however, is not standard practice. Instead, he made the decision to have him showered because he "reeked. With that smock on, all you could smell was — it smelled like urine, and you could smell body odor. It was pretty strong, and I didn't want to transport him like that." (Id. at 36.) Plaintiffs have not shown the existence of a showering custom or that any other inmate's

43

constitutional rights were violated by that custom. Thus, Plaintiffs have not established the existence of any custom that deprived Siple of his constitutional rights.

Moreover, Plaintiffs' argument is unsupported by the record. Plaintiffs contend that the decision to shower Siple was made after it was recognized that he was in need of emergency treatment. Staff Sergeant Stewart was notified at approximately 2:00 p.m. on April 5, 2011, that "there was a need of transport for a medical evaluation." (Id. at 23.) Stewart testified that "[p]rocedurally from in the past that meant for a mental eval. Any time we're told evaluation, it typically means mental evaluation." (Id. at 24-25.) "It was not communicated whether it was emergency or nonemergency." (Id. at 25.) Armed with this knowledge, Stewart decided showering was appropriate given the strong smell of urine and body odor. In fact, when Stewart first suspected that Siple's condition was emergent, he immediately contacted the medical staff and called for EMS transport. (Id. at 37-39.) When asked if he would have taken Siple to shower if he had known it was an emergency situation, Stewart testified, "I would have had him transported directly to the hospital." (Id. at 55-56.) In short, it is undisputed that Stewart was unaware that Siple was in need of emergency treatment when he decided to have him showered.[23]

---

[23] Additionally, neither Stewart's decision to have Siple shower nor the deputies and nurses' response once it was apparent that Siple needed emergency treatment evidence deliberate indifference. According to Stewart, he decided to have Siple showered for his own "dignity." (Stewart Decl. ¶ 5.) And as soon as he became aware that Siple's condition was an emergency, he contacted the medical staff and called for an ambulance. (Stewart Dep. at

Finally, Plaintiffs also claim that Columbia County deprived Siple of his constitutional right to adequate medical care by delegating this duty to SHP's medical and nursing staff. The Eleventh Circuit has held:

> The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals. This duty is not absolved by contracting with an entity such as [an independent contractor]. Although [an independent contractor] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [independent healthcare contractor]. In that sense, the county's duty is non-delegable.

Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 705 (11th Cir. 1985); see also Bell v. Shelby Cnty., Ala., No. 2:12-CV-2991, 2013 WL 2248247, at *6 (N.D. Ala. May 21, 2013) (same). Plaintiffs contend that Columbia County policies permit county personnel, including Sheriff's deputies, to rely wholly on SHP staff to monitor, evaluate, and treat inmates' medical needs. (See Doc. no. 69, Ex. F at 27-30.). Plaintiffs argue that these policies resulted in a violation of Siple's Fourteenth Amendment right to adequate medical care based primarily on the testimony of Deputy Freeman.

Freeman briefly observed Siple in his cell on the morning of April 5, 2011. (Freeman Dep. at 19.) Upon entering the cell with Nurse Brantley, he stated that Siple "doesn't look good." (Id.)

---

37.) Further, Staff Sergeants Stewart and March repeatedly called for an ambulance and the nursing staff continuously attempted to resuscitate Siple until the ambulance arrived. (Id. at 50-54; March Decl. ¶¶ 19-20; Cheek Dep. at 52.) These actions do not show deliberate indifference.

At his deposition he stated that it was his opinion that Siple should have been "take[n] . . . to the hospital or something." (Id. at 41.)   After approximately three minutes in the cell, he then resumed his "normal duties" elsewhere in the CCDC.[24]   (Id. at 19-20.)   Plaintiffs argue that this testimony establishes that the County abdicated its responsibility to provide medical care to inmates by relying solely on SHP staff to ascertain the inmates' medical needs.

The Court disagrees.   First, there is no indication from the record that Sheriff Whittle, on behalf of Columbia County, had notice that these policies were likely to result in the violation of Siple's constitutional rights.   Plaintiffs "ha[ve] neither asserted nor explained why Sheriff [Whittle] should have anticipated these procedures were likely to result in the jail staff's deliberate indifference to [Siple's], or any other inmate's, serious medical needs."   Williams v. Limestone Cnty., Ala., 198 Fed. Appx. 893, 897 (11th Cir. 2006).   Indeed, this claim suffers from the same defect as those above:   Plaintiffs fail to point to any other inmate that suffered a constitutional violation as a result of these policies.   Thus, the record only permits the conclusion that Sheriff Whittle "had every reason to assume medical emergencies would be handled according to the normal routine."   Id.

---

[24]   Plaintiffs also cite the testimony of Staff Sergeants Stewart and March that they believed Siple looked lethargic, frail, and ill that morning, but they nevertheless returned to their normal duties without communicating with the medical staff.   (Stewart Dep. at 15-16; March Dep. at 19.)

46

Second, Columbia County personnel, including Sheriff's deputies, "are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." Id.; see also Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . . Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on."); Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010) ("[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so.").

In this case, Sheriff Whittle promulgated procedures for dealing with inmates' medical needs. These procedures relied primarily on the medical expertise of SHP's physicians and nursing staff. "The fact that alternative procedures, such as providing jail personnel with additional medical training, might have better addressed [Siple's] particular needs does not show that Sheriff [Whittle] was deliberately indifferent to [Siple's] medical needs." See id. at 898. Consequently, Plaintiffs fail to show that a genuine dispute of material fact exists that Columbia County was deliberately indifferent to Siple's serious medical needs.

## 2.    *Sheriff Whittle*

To the extent Plaintiffs' Complaint alleges a § 1983 claim against Sheriff Whittle in his individual capacity,[25] summary judgment is appropriate. To prove that an individual acted with deliberate indifference, Plaintiffs must show: "(1) subjective knowledge of a risk of a serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).

Plaintiffs fail to present any evidence creating a fact question regarding Sheriff Whittle's subjective knowledge of the risk of harm. Sheriff Whittle testified that he "was not aware that [Siple] was an inmate at the [CCDC] until after [Siple] had died." (Whittle Decl. ¶ 7.) Thus, he was "not aware of any specific medical need that [Siple] might have had, and [] was not directly involved in any deicision regarding [Siple's] medical care." (Id. ¶ 8.) And he "had no knowledge that [Siple] needed medical attention that he was not receiving."[26]    (Id. ¶ 9.)

---

[25] Plaintiffs' Complaint alleges that Siple's "death was the direct and proximate result of the deliberate and wanton indifference to [Siple's] constitutional rights . . . by Defendant Columbia County and Defendant Clay Whittle" "for failing to provide [Siple] with proper medical treatment" and "for failing to transport [Siple] to the hospital for medical treatment." (Compl. ¶¶ 40-42.)    It is unclear whether Plaintiffs sought an individual liability claim against Sheriff Whittle. Elsewhere Plaintiffs made it clear that they sought a claim against Sheriff Whittle "in his individual capacity." (Id. ¶ 36.)    Moreover, Plaintiffs' only asserted basis for liability involves Sheriff Whittle's role as a policy maker for Columbia County. (See Doc. no. 69 at 20.) Consequently, it is questionable whether Plaintiffs, in fact, brought a § 1983 claim against Sheriff Whittle in his individual capacity.    However, out of an abundance of caution the Court construes Plaintiffs' Complaint to include such a claim.

[26] The Court is aware that "a party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact." United States v. Baxter Int'l, Inc., 345 F.3d 866, 902 (11th Cir. 2003).

48

Undisputed, this testimony forecloses Plaintiffs' claim against Sheriff Whittle in his individual capacity. Therefore, the County Defendants' motion for summary judgment on Plaintiffs' deliberate indifference claim is **GRANTED**.

### c. Excessive Force Claim

Pursuant to § 1983, Plaintiffs further allege that Defendants Stanley Young, Travis Smith, Travis Whitaker,[27] and David Miller used excessive force to subdue Siple in violation of his Fourteenth Amendment rights.[28]   (Compl. ¶ 46.)  They contend that the use of pepper spray to subdue Siple on March 30, 2011, was not necessary and was applied in retaliation for combative behavior the previous day.

"The Due Process Clause of the Fourteenth Amendment protects pretrial detainees [like Siple] from the use of force that 'shocks the conscience,' which is force that is applied 'maliciously and sadistically for the very purpose of causing harm.'"  Skelly v. Okaloosa Cnty. Bd. of Cnty. Com'rs, 456 Fed. Appx. 845, 847 (11th Cir. 2012) (quoting Danley v. Allen, 540 F.3d 1298, 1306-07 (11th Cir. 2008), overruled on other grounds by Ashcroft v. Iqbal, 556 U.S. 662 (2009)).  In Fourteenth Amendment excessive force cases, the "core

---

Plaintiffs, however, do not assert or present any facts demonstrating that Sheriff Whittle willfully blinded himself either to Siple's serious medical needs or to any constitutional violations resulting from Columbia County policies or customs.

[27]    Plaintiffs concede, however, that summary judgment is appropriate for Defendant Travis Whitaker.  (See Doc. no. 69 at 23.)

[28]    Like Plaintiffs' deliberate indifference claim, Siple's constitutional rights as a pretrial detainee are secured by "the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause."  Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).  However, "the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees."  Id.

judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (internal quotation omitted).

In determining whether the force was applied maliciously and sadistically to cause harm, courts consider several factors, including: "(a) the need for the application of force; (b) the relationship between the need and the amount of force that was used; (c) the extent of the injury inflicted upon the prisoner; (d) the extent of the threat to the safety of staff and inmates; and (e) any efforts made to temper the severity of a forceful response." Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009). The Court considers these factors "as reasonably perceived by" the correctional officer based on the facts known to him at the time and "give a wide range of deference to prison officials acting to preserve discipline and security." Id. (internal quotation omitted). Additionally, "[t]he existence of 'a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives' is not enough to support a claim of excessive force in an institutional setting." Scroggins v. Davis, 346 Fed. Appx. 504, 505 (11th Cir. 2009) (quoting Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999)).

Initially, Plaintiffs argue that the use of pepper spray was not necessary. The undisputed evidence, however, fails to show that the use of pepper spray was malicious or sadistic. Siple was creating a disturbance by screaming and kicking on the door of the padded cell.

50

(Young Decl. ¶¶ 10-11.)   Lieutenant Young ordered that Siple be restrained in the restraint chair until he calmed down so that he would not hurt himself.  (Young Dep. at 47.)   Young then ordered Siple to turn around and face the wall of the cell.   However, "as the deputies went in to escort him out of the cell, he turned around and started resisting in an attempt not to be placed in [the] chair." (Id. at 49.)   Although "five or six" deputies were attempting to subdue him, Siple continued to resist and could not be restrained in the chair.  (Id. at 50.)   In the process, Siple kicked Sergeant David Miller in the back.   (Id. at 51.)   It was at this point that Lieutenant Young ordered everyone back and applied the pepper spray to Siple's face.  (Id. at 49.)

Plaintiffs argue that the pepper spray was unnecessary because Siple was partially restrained when he was sprayed and Young testified that he believed the officers "probably" could have restrained Siple without using the spray.  (Id. at 51.)   First, there is no evidence that Siple was restrained in any meaningful way.   Sergeant Miller testified that Siple's "legs were not restrained.   I believe he had one arm partially -- or in the arm restraint, but I couldn't tell you if it was completely strapped down or not, and I believe he had the lap restraint on, but it wasn't cinched down."[29]  (Miller Dep. at 29.) "If all the deputies would have walked away, [Siple] could have got up and walked out.   He wasn't cinched down or handcuffed."  (Id.)

---

[29]   Lieutenant Young also testified that "one of [Siple's] arms was in the strap, but I'm not sure whether it was secure or not."  (Young Dep. at 50.)

Second, Lieutenant Young's testimony does not establish that the use of the pepper spray was unnecessary. The law of this Circuit permits the use of force used to subdue Siple. "When prisoners or detainees repeatedly fail to follow orders, the need for force is established."[30] Youman v. Wood, No. 4:10-CV-248, 2010 WL 3958703, at *3 (N.D. Fla. Aug. 16, 2010) (citing Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)). "Moreover, physical resistance by a prisoner in the close confines of a prison is an exceptionally dangerous event that must be stopped immediately." Id. at *3 (citing Fennell, 559 F.3d at 1219). Additionally, Young explained his reasoning for applying the spray: "But at the time, the way he was violently kicking and wriggling his body and resisting, I didn't feel that it should go any further, someone would wind up getting hurt, possibly deputies and possibly himself." (Young Dep. at 51.) The Supreme Court is clear that this determination is to receive a measure of deference and that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourteenth Amendment. Graham v. Connor, 490 U.S. 386, 396 (1989) (internal citation omitted).

Further, Plaintiffs contend that the use of pepper spray was applied maliciously and sadistically. Plaintiffs present two arguments in support of this claim. First, they argue that a jury could reasonably infer Defendants' malicious purpose because Defendants did not immediately decontaminate Siple, but instead waited

---

[30] "[P]rison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out." Danley, 540 F.3d at 1307. Thus, "officers are not required to stand around all day to remove a prisoner from his cell." Youman, 2010 WL 3958703, at *3.

nearly five minutes before taking him to the shower. The Court disagrees. Sergeant Miller testified that "when somebody is sprayed . . . we try to get people down there that are fresh, that don't have the spray in their eyes or in the surroundings to help." (Miller Dep. at 39.) He recalled that the officers assisting with Siple were suffering from "residual effects" of the spray and thus they placed Siple in his cell temporarily in order to "regroup, [and just to] get everybody there to get him to the shower to decontaminate him." (Id. at 30.) Plaintiffs present no evidence to dispute this testimony.

Second, Plaintiffs argue that a jury could reasonably infer that Defendants only employed the spray as punishment or retaliation for Siple's disruptive behavior the previous day. However, Plaintiffs do not cite any evidence supporting such an inference. Compare Scroggins, 346 Fed. Appx. at 506-07 (there was no evidence of malicious or sadistic purpose even though the sheriff declared "[t]hat's what you get for swinging on one of my deputies, a--hole" when inmate asked why he had been sprayed) with Danley, 540 F.3d at 1304 (court found a malicious and sadistic purpose to cause harm where jailors laughed, made fun of, and made "mock-choking" gesture while inmate screamed and cried that he could not breathe). Here, Plaintiffs attempt to avoid summary judgment by speculating as to the deputies' purpose. However, "[s]peculation does not create a genuine issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). Without any statement, action by one of the deputies, or other circumstances indicating a

malicious or sadistic purpose to cause Siple harm, Plaintiffs' bald assertion that Defendants sprayed Siple "to teach him a lesson" will not preclude summary judgment. Accordingly, the County Defendants' motion for summary judgment is **GRANTED** on Plaintiffs' excessive force claim.

### d. Punitive Damages and Attorneys' Fees

Plaintiffs also alleged claims for punitive damages and attorneys' fees. (Compl. ¶¶ 59, 61.) These claims are derivative of Plaintiffs' substantive claims. Because the Court has found that Plaintiffs failed to present evidence creating a genuine dispute of material fact on any of their substantive claims, Plaintiffs' claims for punitive damages and attorneys' fees fail as a matter of law. Consequently, the County Defendants' motion for summary judgment is **GRANTED** on Plaintiffs' claims for punitive damages and attorneys' fees.

### IV. CONCLUSION

For the reasons stated above, SHP's motion to strike the testimony of Dr. South (doc. no. 50) is **GRANTED.** Plaintiffs' motions to strike the testimony of Dr. Wilcox (doc. no. 60) and Dr. Broadwater (doc. no. 61) are **DENIED AS MOOT.** Additionally, SHP's motion for summary judgment (doc. no. 51) is **GRANTED** and the County Defendants' motion for summary judgment (doc. no. 52) is **GRANTED.** Accordingly, the Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor

of SHP and the County Defendants.    The Clerk **SHALL** terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this _31st_ day of March, 2014.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

55